DA 06-0066

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 175

STATE OF MONTANA,

       Plaintiff and Respondent,

  v.

DANIEL IVAN SKINNER,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 04-666
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jim Wheelis, Chief Appellate Defender; Lisa S. Korchinski,
          Assistant Appellate Defender, Helena, Montana

      For Respondent:

          Honorable Mike McGrath, Attorney General; Ilka Becker,
          Assistant Attorney General, Helena, Montana

          Dennis Paxinos, County Attorney; Christopher Morris and
          Ann-Marie McKittrick, Deputy County Attorneys, Billings, Montana

Submitted on Briefs:  June 13, 2007

Decided:  July 17, 2007

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Defendant Daniel Skinner appeals his conviction for incest. He claims that the evidence presented at trial was insufficient to prove all elements of the crime, that his right to impeach witnesses was denied, and that the District Court impermissibly commented on the evidence. We affirm.

¶2 We restate the issues as follows:

¶3 I. Did the District Court err in denying Skinner's motion for a directed verdict?

¶4 II. Did the District Court err when it prohibited impeachment of a witness with another person's out-of-court statement?

¶5 III. Did the District Court show bias when it commented "[t]he Supremes can read it"?

**BACKGROUND**

¶6 On July 18, 2004, Skinner was arrested for incest. After several continuances, a jury trial was held in June of 2005. The trial lasted five days and resulted in a guilty verdict.

¶7 T.D., the victim, was eleven years old at the time of the crime. At trial, T.D. and her mother testified that Skinner was T.D.'s biological father but had not been part of their lives since T.D. was about two years old. However, according to T.D and her mother, T.D. had maintained some contact with Skinner through written letters from the time she was nine until the time of the incident. T.D. also added a page dedicated to Skinner in her scrapbook. In the middle of the page is a picture of Skinner. At the top

T.D. wrote "Dad!" and around the picture she wrote characteristics that she associated with Skinner, such as his height and that he lifts weights.

¶8 In early July of 2004, Skinner arrived in Billings, where T.D. and her mother lived. He initially stayed with his sister. Around July 10, Skinner met T.D. when she returned from church camp and a few days later he began to spend nights at T.D. and her mother's house (the house).

¶9 On July 17, 2004, Skinner, T.D. and T.D's mother attended a barbeque at the home of Skinner's sister, whom T.D. referred to at trial as "my Aunt Brenda." At the barbeque, Skinner's nephew, Bryce, then twelve years old, was invited to spend the night at the house. T.D., during trial, labeled Bryce, who is the son of Brenda, as her cousin. During the barbeque Skinner was drinking beer. Skinner continued to drink beer after he and T.D. and T.D's mother returned to the house. When T.D.'s mother subsequently went to work, Skinner was left in charge of watching T.D. and Bryce.

¶10 Later that same evening, Skinner took T.D. and Bryce to Wal-Mart where he purchased beer for himself and candy and soda for the children. At Wal-Mart they met Dillan Ausburn, who lived near T.D., and Skinner invited him back to the house to drink. T.D. and Bryce, once back at the house, watched television and played video games in T.D.'s room and both eventually fell asleep with T.D. on her bed and Bryce on the floor with a blanket. At some point Bryce noticed that Skinner was not home and informed T.D. T.D. assumed he was on an errand. Skinner, in fact, had gone to a bar with Ausburn.

¶11   At approximately 2:00 a.m., T.D. awoke because she felt a hand down the back of her underwear.  T.D. began to turn over and the hand was removed.  T.D. noticed that Bryce was sleeping on the bed with her.  T.D. then saw a man standing by the door that she recognized as Skinner because of his height, facial hair, and distinctive "rattlesnake" braids.  T.D. testified that she was "[a] hundred percent" certain the man was her dad. When she looked at Skinner, he turned and left the room.  After thirty minutes or so, T.D. left through the window in her room and went to her neighbor's home.  There she told the neighbor what had happened.  The neighbor called T.D.'s mother and then the police. Skinner was arrested when he returned to the home at around 5:00 a.m.

¶12   During the trial, defense counsel, during cross-examination, asked one of the detectives who investigated the case how the crime occurred.  The detective answered, "[w]ell, his daughter reported that she woke from sleep to find her dad leaning over her bed with his hands in her pants."  Later, defense counsel asked, "[n]ow, you just testified a minute ago that the characterization, I think, was that Mr. Skinner leaned over the bed; is that correct?"  The State objected, noting that the question asked for a hearsay statement.  The court, at this point, allowed defense counsel to continue.  Counsel then asked the detective, "[c]an you show me where in your investigation it says anything about him - - about any witness saying that they saw Dan Skinner leaning over the bed?" The State again objected, noting that defense counsel "[is] cross-examining him on hearsay statements that he didn't make."  The court sustained the objection.  Defense counsel then asked the court, "Judge, if I may just put my objection on the record."  The court responded: "[y]es.  Fine.  So noted.  You've asked the question, I've overruled it.

4

You don't have to say anything more. The Supremes can read it." Counsel replied, "[t]hank you, Judge."

¶13 At the close of the State's case-in-chief, defense counsel moved for a directed verdict, arguing that the State failed to prove paternity. The court denied the motion. Skinner was then convicted of incest. This appeal followed.

## STANDARD OF REVIEW

¶14 The proper standard of review for the denial of a motion for a directed verdict of acquittal is *de novo*. *State v. Swann*, 2007 MT 126, ¶ 19, 337 Mont. 326, ¶ 19, 160 P.3d 511, ¶ 19. A directed verdict is only appropriate if, viewing the evidence in a light most favorable to the prosecution, there is no evidence upon which a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Swann*, ¶ 16 (citations omitted).

¶15 Additionally, we review evidentiary rulings for abuse of discretion. *State v. Price*, 2006 MT 79, ¶ 17, 331 Mont. 502, ¶ 17, 134 P.3d 45, ¶ 17 (citations omitted). Notwithstanding this deferential standard, however, judicial discretion must be guided by the rules and principles of law; thus, our standard of review is plenary to the extent that a discretionary ruling is based on a conclusion of law. *Price*, ¶ 17.

## DISCUSSION

¶16 **I. Did the District Court err in denying Skinner's motion for a directed verdict?**

¶17 A person commits incest if he knowingly has sexual contact with a descendant. Section 45-5-507(1), MCA. "Sexual contact" is defined as "touching of the sexual or

5

other intimate parts of the person of another . . . in order to knowingly or purposely: (a) cause bodily injury to or humiliate, harass, or degrade another; or (b) arouse or gratify the sexual response or desire of either party." Section 45-2-101(67), MCA.

¶18 On appeal, Skinner claims that the State failed to prove two elements of the crime of incest. First, the State, according to Skinner, submitted no evidence as to whether Skinner intended to humiliate another or to arouse or gratify the sexual response of either himself or T.D. Second, Skinner claims that the State failed to prove paternity. During Skinner's motion for a directed verdict, Skinner only presented his no proof of paternity argument.

¶19 A. Did the State present sufficient evidence of "sexual contact"?

¶20 1. *Appealable?*

¶21 As a preliminary matter, the State asserts that Skinner waived appellate review of whether there was sufficient evidence of sexual contact by failing to raise the issue below. However, as both the State and Skinner point out, a defendant does not have to raise a sufficiency of the evidence objection in district court to preserve the issue for review. *State v. Granby*, 283 Mont. 193, 198-99, 939 P.2d 1006, 1009 (1997). As such, we proceed to review Skinner's claim.

¶22 2. *Sufficient evidence of "sexual contact"?*

¶23 There are two prongs necessary to prove "sexual contact," as outlined above. Both prongs need to be proven. *See State v. Riley*, 270 Mont. 436, 441, 893 P.2d 310, 314 (1995). Skinner claims that the second, "intent" prong was not met because the State has submitted no evidence to prove that Skinner purposely or knowingly injured,

6

humiliated, harassed or degraded T.D. Additionally, and more specifically, Skinner asserts that there was nothing in T.D.'s testimony suggesting that Skinner was aroused. T.D. testified that when she saw Skinner, he was across the room and the lights were off. She testified as to his identifying markers, but not to any other physical characteristics, such as facial expression.

¶24 Nevertheless, it is well-settled that the jury may infer intent of sexual arousal from the defendant's acts. *Riley*, 270 Mont. at 441, 893 P.2d at 314. Here, while there is no direct evidence of arousal, such as an erection, there is sufficient circumstantial evidence for the jury to infer arousal, or that the purpose of Skinner's act was arousal. Skinner was not casually touching T.D. during an ordinary act. He snuck into her bedroom at 2 a.m. while she was sleeping, put his hand down her underwear, and attempted to penetrate her vagina. When T.D. rolled over he stopped and walked to the door. Then, when she looked at him, Skinner turned and left without saying anything. Whether or not Skinner was actually aroused when T.D. saw him, a jury may infer that the purpose of Skinner's suspect acts was arousal.

¶25 B. Did the State present sufficient evidence of paternity?

¶26 Skinner asserts that the testimony of T.D. and her mother regarding Skinner's paternity was insufficient, without further corroborating evidence, to sustain a conviction for a sex offense. Although Skinner acknowledges that the uncorroborated testimony of a victim may sustain a conviction for a sex offense, Skinner asserts that this general rule should not apply to more defined elements of incest, including the element of sexual contact with a "descendant."

7

¶27 A conviction for a sex offense may be based *entirely* on the uncorroborated testimony of the victim, regardless of whether the victim is a child. *State v. Gardner*, 2003 MT 338, ¶ 29, 318 Mont. 436, ¶ 29, 80 P.3d 1262, ¶ 29 (citations omitted). Here, testimony that Skinner is T.D.'s biological father was given not just by T.D., but also by T.D.'s mother. Further, T.D. and Skinner had been exchanging letters for two years, T.D. had labeled Skinner "Dad" in her scrapbook, and T.D. considered Skinner's sister as her aunt and Skinner's nephew as her cousin. Based on this evidence, a rational trier of fact could conclude, beyond a reasonable doubt, that Skinner was T.D.'s biological father.

¶28 Consequently, the District Court did not err in denying Skinner's motion for a directed verdict.

¶29 **II. Did the District Court err when it prohibited impeachment of a witness with another person's out-of-court statement?**

¶30 Skinner argues that he was not allowed to impeach the testimony of the detective during cross-examination. The detective testified that T.D. reported waking up to find Skinner "leaning over [T.D.'s] bed with his hand in her pants." Later during the same cross-examination, Skinner sought to show the detective's characterization of T.D.'s statement was inconsistent with T.D.'s previous statements to the police. However, he was prevented from doing so when the court sustained the State's hearsay objection. Skinner claims that this ruling violated not only the rules of evidence, but also his constitutional right to confront the witnesses against him.

¶31 The Confrontation Clause "guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever

8

extent, the defense might wish." *State v. Jenkins*, 2001 MT 79, ¶ 19, 305 Mont. 95, ¶ 19, 23 P.3d 201, ¶ 19 (emphasis in the original) (citations omitted). Here, Skinner was given an opportunity to and in fact did cross-examine the detective. Therefore, the issue is not constitutional in nature but evidentiary, which we review for an abuse of discretion. *Price*, ¶ 17.

¶32 Skinner, in essence, sought to use a prior statement made by T.D. to impeach the detective. A witness's own prior inconsistent statement is admissible as "not hearsay," if the prior statement was made at a trial or hearing and was subject to cross-examination. M. R. Evid. 801(d)(1). This hearsay exclusion clearly does not apply to someone else's prior inconsistent statement. Skinner, however, now argues on appeal, that since the prior statements were not offered to prove the truth of the matter asserted, but to impeach the testimony of the detective, they were not hearsay.

¶33 However, Skinner did not raise this argument below, before the District Court. The State specifically objected to the question as calling for hearsay and the court sustained the objection. Defense counsel, while "objecting" to the court's ruling, did not make an "offer of proof" that the purpose of discussing T.D.'s previous statements was not to prove the truth of the matters asserted within those statements. Error may not be predicated upon a ruling that excludes evidence unless a substantial right of the party is affected and an offer of proof is made. M. R. Evid. 103(a)(2). Here no substantial right, such as the right to confront witnesses, was infringed and no offer of proof was made. Therefore, we conclude that the District Court did not abuse its discretion by excluding T.D.'s prior statements.

9

¶34 **III. Did the District Court show bias when it commented "[t]he Supremes can read it"?**

¶35 Finally, although he failed to object below, Skinner contends that we should review the District Court's comment, "[t]he Supremes can read it," under the plain error doctrine because it compromised the court's impartiality in front of the jury by assuming the guilt and eventual conviction of Skinner.

¶36 A judge should avoid officious interference in the proceedings and must at all times maintain impartiality in demeanor as well as in actions. *Price*, ¶ 21 (citations omitted). However, while it is true that a district court may not comment on the evidence, it is also true that failure to object waives a claim of error unless a substantial right of the party is affected. *Clark v. Norris*, 226 Mont. 43, 53, 734 P.2d 182, 188 (1987) (citations omitted). The substantial right that may be affected for purposes of the plain error doctrine is "the integrity of the judicial process." *See State v. Daniels*, 2003 MT 247, ¶ 20, 317 Mont. 331, ¶ 20, 77 P.3d 224, ¶ 20 (describing the tenets of the plain error doctrine).

¶37 Here, the court's comment is not a sufficient threat to judicial integrity to invoke the plain error doctrine, which is to be employed sparingly. *See Daniels*, ¶ 20. It is unlikely that any juror inferred guilt from the court's comment. Defense counsel was attempting to cross-examine the detective concerning T.D.'s prior statements, as explained above. The State objected on hearsay grounds, and the court sustained the objection. At this point, instead of considering the matter sustained, or making an offer of proof that the question did not call for hearsay, defense counsel asked if the court

10

would "put [his] objection on the record." Of course, the objection, or more specifically the fact that his line of questioning was objected to and sustained, was *already on the record*. No additional objection was necessary. The court, therefore, advised Skinner's counsel that he did not "have to say anything more. The Supremes can read it." Put in context, the court was simply explaining that no additional "objection" was necessary to preserve the issue for potential appellate review. Although trial courts should refrain from such comments in front of the jurors, this comment did not compromise the integrity of the judicial process.

## CONCLUSION

¶38 The District Court did not err in denying the motion for a directed verdict or in sustaining the State's hearsay objection. Additionally, the court's commentary did not compromise the integrity of the judicial process. Consequently, we affirm the judgment of the District Court.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ JIM RICE

11