FILED

01/26/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0071

DA 19-0071

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 15

STATE OF MONTANA,

      Plaintiff and Appellee,

   v.

JUSTIN QUINLAN,

      Defendant and Appellant.

APPEAL FROM:     District Court of the Sixteenth Judicial District,
In and For the County of Rosebud, Cause No. DC 17-31
Honorable Nickolas C. Murnion, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Moses Okeyo, Assistant Appellate
Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, C. Mark Fowler, Assistant
Attorney General, Helena, Montana

          C. Kristine White, Rosebud County Attorney, David Ole Olson, Special
Assistant County Attorney, Forsyth, Montana

Submitted on Briefs:  November 4, 2020

Decided:  January 26, 2021

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Justin Quinlan appeals his conviction after jury trial in the Sixteenth Judicial District, Rosebud County, of Incest, in violation of § 45-5-507(1), (5), MCA.  We restate the issues as follows:

  1. *Did the District Court err by precluding Quinlan from introducing extrinsic evidence to challenge S.Q.'s credibility?*

  2. *Did the District Court's evidentiary ruling violate Quinlan's right to confrontation under the Sixth Amendment to the United States Constitution and Article II, § 24, of the Montana Constitution?*

¶2     We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     Justin and Heather Quinlan met as teenagers and were engaged in a relationship for over twenty years.[1]  The Quinlans lived in the unincorporated town of Rosebud, Montana, in Rosebud County, and had three children:  A.Q., S.Q., and Q.Q.  Although he provided for his family, Justin Quinlan (Quinlan) was not usually attentive to his children.  When not working, Quinlan typically repaired derby cars.  Quinlan and Heather fought extensively in the children's presence, primarily about Quinlan's serial infidelity, about which the children were aware.  In 2014, A.Q. and S.Q. witnessed Quinlan engaging in relations with another woman.  Heather was seven months pregnant with Q.Q. at the time.

¶4     Following a referral from S.Q.'s school, Patti Fitterer and Sway Guitierez, a behavioral intervention specialist and licensed social worker, respectively, with the Eastern

---

[1] The Quinlans divorced in 2018, after 12 years of marriage.

Montana Community Mental Health Center, counseled S.Q. on social and organizational skills, from April 2015 to May 2016. S.Q. confided to them her frustration over Quinlan's infidelity and her desire to spend more time with him.

¶5 In the early days of August 2016, Heather went to Spokane, Washington to care for her ailing father. Anticipating being gone for multiple weeks, Heather left S.Q., then 11 years old, in the care of Misty Zweifel, the mother of one of S.Q.'s friends, during the weekends. S.Q. returned home on weekdays to stay with Quinlan and A.Q., her older brother. On Sunday, August 14, Quinlan took S.Q. fishing and she proudly caught a catfish. On August 15, Quinlan and S.Q. travelled to Miles City to purchase supplies, and stayed with Quinlan's mother, Theresa Williams, that night. While Quinlan was at work the next day, S.Q. went to the home of her friend, A.A., to play for the afternoon. Just before suppertime, S.Q. made her first statement regarding Quinlan, telling A.A., while shaking and tearing up, that her father was practicing "sex ed" on her. A.A. relayed this information to her mother, Shanda Anderson, who spoke with S.Q. about her statement. S.Q. provided few details, but Anderson testified that S.Q. was crying and shaking, and Anderson contacted Heather in Spokane. Heather was initially skeptical of S.Q.'s assertions and, after speaking to Anderson and S.Q. on the phone, directed her mother-in-law, Williams, to pick up S.Q. from the Anderson home. Heather notified Quinlan of S.Q.'s statement.

¶6 Williams immediately took S.Q. to the emergency room at the Rosebud Health Center. On the way, S.Q. said only, "I'm sorry grandma." Lorraine Ackerman, a nurse

3

practitioner, interviewed S.Q. and performed a physical exam. S.Q. told Ackerman that Quinlan tried to have sex with her a few days ago and provided details of several sexual encounters with Quinlan. Ackerman examined S.Q., finding no trauma, and she reported the incident to the Department of Public Health and Human Services (Department).

¶7 Jennifer Winkley, a Child Protection Supervisor for the Department, received Ackerman's report and assigned the case to Sheana Rose, a Child Protection Specialist. Winkley conveyed the allegations to Rosebud County Sheriff Allen Fulton, who, with the consent of both Heather and Quinlan, conducted a forensic interview of S.Q. Officer Bridger Wren of the Sheriff's Department and Rose observed the interview in an adjacent room. Providing a rough narrative, S.Q. described three or four incidents that happened "around last week." Specifically, she told Winkley that Quinlan put his "bad spot" in her "bad spot" and that "it happened mostly in the butt," and described Quinlan making her get down on her hands and knees. S.Q. said she did not want her dad to go to jail. After the interview, the Department put a protection plan in place that prohibited Quinlan from having contact with S.Q.

¶8 Later that afternoon, Fulton and Wren contacted Quinlan, who agreed to an interview. Quinlan did not admit to the allegations, but stated that if they had happened, he did not remember them, and thus he must have been sleeping. Quinlan consented to a search of his home, and Wren collected a bedsheet, blanket, and two pairs of Quinlan's underwear as evidence.[2] Rose interviewed S.Q.'s family members and, learning that many

---

[2] Expert testimony at trial stated that only Quinlan and an inconclusive female's DNA was found as physical evidence.

4

of them did not believe her accusations, determined the best course of action was to place S.Q. into voluntary foster care to protect her from future psychological harm. After Rose received reluctant consent from Heather, the Department placed S.Q. with Robin and Kyle Wolff in Miles City. Q.Q. was placed with them a few days later. While there, S.Q. craved attention and repeatedly expressed frustration about her parents' relationship. The Department required the Wolffs to complete reports about S.Q.'s behavior, including her truthfulness.

¶9 S.Q. was subsequently examined by Abbey Burger, a board-certified obstetrician-gynecologist, in Billings, and underwent a second forensic interview with Jace Beckett of the Rosebud County Sheriff's Office. Both times she described three discrete incidents with Quinlan, with varying detail, sometimes stating, "I don't remember" or "I'm trying to keep my mind off of it." Burger's examination produced no physical findings of sexual assault.

¶10 In June of 2017, S.Q.'s foster mother, Robin, delivered to the Department a letter written by S.Q. recanting her allegations against Quinlan. During a session with her then-counselor, Pam Colombik, S.Q. explained she wrote the letter because she was upset with her foster parents and wanted to go home. The Department has no record of the letter, and its location is unknown. The following month, in July 2017, Colombik assisted S.Q. in constructing a trauma narrative recounting the events, and S.Q. shared the narrative with Heather. In August of 2017, the Rosebud County Attorney filed an Information alleging Quinlan committed Incest, "[o]n or about August 2 through 16, 2016."

¶11 The State moved the District Court in limine to prohibit Quinlan from introducing "evidence, questions or statements related to . . . alleged lies told by [S.Q.] without obtaining prior permission" from the court. The State expressed concern that Quinlan would inappropriately use character evidence to portray S.Q as a "bad kid." Quinlan countered by arguing he should be allowed to confront S.Q. during cross-examination to challenge her credibility and veracity. The District Court reserved ruling on the admissibility of the evidence until trial, and required Quinlan to first obtain leave from the court to mention "alleged prior bad conduct or alleged lies" by S.Q., outside the presence of the jury.

¶12 In her trial testimony, S.Q. regularly provided simple one-word answers or remained unresponsive for multiple minutes to questions surrounding the allegations and her parents, especially their tumultuous relationship. The District Court eventually permitted the prosecution to ask leading questions to elicit testimony from her. S.Q. spoke about four instances of abuse. The first occurred while S.Q. was sitting on Quinlan's lap watching television. Quinlan took off S.Q.'s clothes and touched her. The second occurred the following day in Quinlan's bedroom. The third again occurred in Quinlan's bedroom, when Quinlan took off S.Q.'s clothing and had her lay down. The fourth occurred in Quinlan's bedroom, when Quinlan had S.Q. get on her hands and knees and lay down in various positions. Except for the first instance, S.Q. testified that Quinlan touched her butt and "bad spot" with Quinlan's "male part." S.Q. was inconsistent on whether A.Q. was

home during the incidents, but ultimately settled on the opinion that A.Q. was home during every incident.

¶13     At a break in S.Q.'s testimony, the District Court addressed the reserved evidentiary issues outside the presence of the jury. The State expressed concern that the defense was improperly attempting to introduce extrinsic evidence of specific instances of conduct, i.e., lying, to impeach her credibility. The defense argued it was entitled to introduce evidence of S.Q.'s untruthfulness, and the court inquired, "so tell me exactly which lies do you want to delve into." Defense counsel explained:

> MS. HARADA: She lied to Robin and Kyle about stealing at school. She lied to Robin and Kyle about getting in trouble for bullying on the school bus. She lied to Robin and Kyle about using the F word at school. She lied about Kyle smacking her. She lied about downloading Instagram. Those are the main lies I'd like to get into.
>
> .    .    .
>
> MS. HARADA: Well also she told her – I think she told her social worker that Kyle had smacked her.
>
> THE COURT: So your inquiry would be limited – limited to whether she lied about those incidences?
>
> MS. HARADA: Yes.
>
> .    .    .
>
> MS. HARADA: Not whether she actually did those things but whether she lied about them.
>
> .    .    .
>
> MS. HARADA: I'm not trying to emphasize the conduct I'm trying to emphasize the lie.

7

The District Court ruled:

> THE COURT: Well I'm going to allow the inquiry into the truthfulness of these instances that you have [] indicated you've wished to inquire in under the care of Robin and Kyle. As far as extrinsic evidence, I am only going to allow you to inquire into the evidence of truthfulness or untruthfulness with regard to say Robin and Kyle so you can inquire into that kind of general statement, whether they believe she was truthful or untruthful. I'm not going to allow inquiry into those specific instances.
>
> .   .   .
>
> THE COURT: You can inquire into Robin and Kyle about her reputation for truthfulness you . . .
>
> MS. HARADA: Just generally?
>
> THE COURT: Generally, alright? That's the ruling of the Court. I agree with the State. I believe these are subsequent happenings. They are after the fact. They are sometime two (2) years after the fact [,] I believe [,] that's why I'm limiting it.
>
> .   .   .
>
> THE COURT: The relevance is somewhat limited. I think that there is [] a problem with unfair prejudice so I'm going to limit it however to character for truthfulness. So you can inquire under cross examination, you can inquire if there's a [] denial of Robin and Kyle regarding [] character for truthfulness or untruthfulness but I want it limited to that, okay?

¶14    On cross-examination of S.Q., defense counsel asked S.Q. whether she lied in the five specific circumstances. S.Q. answered each question with either "yes" or "no" responses. Further, defense counsel questioned witnesses regarding S.Q.'s truthfulness, including Heather, A.Q., Rose, Williams, Gutierez, Wolff, and A.A.

¶15    Following a six-day trial, the jury found Quinlan guilty of Incest. He appeals, challenging the District Court's evidentiary ruling.

8

**STANDARD OF REVIEW**

¶16 Except suits for libel or slander under Article II, § 7 of the Montana Constitution, "all questions of law, including the admissibility of testimony, the facts preliminary to such admission, the construction of statutes and other writings, and other rules of evidence, must be decided by the court." Section 26-1-201, MCA. Trial courts enjoy broad discretion in determining whether evidence is relevant and admissible, and this Court reviews those evidentiary rulings for an abuse of discretion. *State v. Zimmerman*, 2018 MT 94, ¶ 13, 391 Mont. 210, 417 P.3d 289 (citing *State v. Meyer*, 2017 MT 124, ¶ 12, 387 Mont. 422, 396 P.3d 1265); *Callahan v. Chicago, Burlington & Quincy R.R. Co.*, 47 Mont. 401, 411, 133 P. 687, 689 (1913). This Court considers whether the lower court has acted "arbitrarily, without conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice." *State v. Pelletier*, 2020 MT 249, ¶ 12, 401 Mont. 454, 473 P.3d 991 (citations omitted). If an appellant demonstrates any abuse of discretion, then we must determine whether the demonstrated abuse constitutes reversible error, i.e. an error that affects substantial rights or "the evidence in question was of such character as to have affected the outcome of the trial." *State v. Wilson*, 2011 MT 277, ¶ 17, 362 Mont. 416, 264 P.3d 1146 (citing *Seltzer v. Morton*, 2007 MT 62, ¶ 65, 336 Mont. 225, 154 P.3d 561). *See also* M. R. Evid. 103(a). Since trial courts are bound by the Montana Rules of Evidence, any rulings based on the interpretation of an evidentiary rule is reviewed *de novo* for correctness. *Pelletier*, ¶ 12 (citing *State v. Christensen*, 265 Mont. 374, 375-76, 877 P.2d 468, 469 (1994)).

**DISCUSSION**

¶17 *1. Did the District Court err by precluding Quinlan from presenting extrinsic evidence to undermine S.K.'s credibility?*

¶18 Quinlan contends the District Court erred by prohibiting him from offering extrinsic evidence of specific instances of lying by S.Q. to challenge her credibility, arguing. "[t]he conclusion that Quinlan's challenge to S.Q.'s credibility was inadmissible because the challenge was being made with extrinsic evidence failed to acknowledge the pertinent exception of Rule 608(b), which provides that specific instances of conduct may be inquired into on cross-examination concerning the witness's character for truthfulness or untruthfulness if the evidence is probative of such." He contends his defense was prejudiced because he was prohibited from demonstrating "S.Q.'s bias or motive to testify falsely."

¶19 Unless otherwise excluded by law, "[a]ll relevant evidence is admissible." M. R. Evid. 402. Relevant evidence may be excluded by the trial court "if its probative value is substantially outweighed by danger of unfair prejudice,[3] confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M. R. Evid. 403. Character evidence is not admissible "for the purpose of proving action in conformity therewith on a particular

---

[3] "Unfair prejudice can arise from facts that arouse the jury's hostility or sympathy for one side without regard to its probative value, evidence that confuses or misleads the trier of fact, or evidence that might unduly distract the jury from the main issues." *State v. Thompson*, 263 Mont. 17, 28-29, 865 P.2d 1125, 1132 (1993) (citing 1 J. Strong, *McCormick on Evidence* § 185 (4th ed. 1992)).

occasion," M. R. Evid. 404(a), with the exception, pertinent here, that evidence of a witness's character is permissible under parameters provided in the Rules. *See* M. R. Evid. 404(a)(3) (providing that evidence of witness character is admissible, "as provided in Article VI.")[4] In turn, M. R. Evid. 608(b) provides that "[s]pecific instances of conduct of a witness, for the purpose of attacking or supporting the witness' credibility, may not be proved by extrinsic evidence," but they may, "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness [] concerning the witness' character for truthfulness or untruthfulness." *See also* § 26-1-302, MCA; *Zimmerman*, ¶ 23. We have explained that, "by definition, specific instances of prior conduct probative of a witness's character for untruthfulness narrowly include prior instances where the witness lied, made false reports or accusations, or otherwise acted dishonestly, untruthfully, deceitfully, or fraudulently." *Pelletier*, ¶ 17 (collecting cases).

¶20 As explained above, Quinlan sought to inquire into five occasions when S.Q. had assertedly told a lie. These asserted lies constitute "specific instances of prior conduct probative of [S.Q.'s] character for untruthfulness," *Pelletier*, ¶ 17, and, therefore, while M. R. Evid. 608(b) forbids proof of these instances by extrinsic evidence, it permits inquiry about the instances on cross-examination, subject to "the discretion of the court." As we have summarized:

> [A] party may impeach the credibility of a witness via "opinion or reputation" evidence regarding the witness's character for "untruthfulness." M. R. Evid. 404(a)(3) and 608(a). A party may also cross-examine the

---

[4] For a discussion of character evidence, *see Pelletier*, ¶ 15, which was decided after completion of the briefing in this case.

witness regarding specific instances of his or her prior conduct for the purpose of impeaching his or her credibility if probative of the witness's character for untruthfulness. M. R. Evid. 608(b). However, unlike with Rule 404(a)(1) good character impeachment and rebuttal evidence, a party may not introduce extrinsic evidence to impeach or rebut a witness's character for truthfulness under Rule 608(b). M. R. Evid. 608(b).

*Pelletier*, ¶ 17 (footnotes omitted).

¶21 In its ruling, the District Court cited concerns about the relevance of the instances and the unfair prejudice they could cause. It explained the instances were "subsequent happenings," "after the fact," and "sometime two [] years after" S.Q. had first reported Quinlan's crimes. The District Court also indicated the instances raised "a problem of unfair prejudice." These are appropriate considerations for the court when evidence is offered under Rule 608(b). *See State v. Passmore*, 2010 MT 34, ¶¶ 63-64, 355 Mont. 187, 225 P. 3d 1229 (providing an example and stating that "[a] trial court has broad discretion to exclude [Rule 608(b)] evidence under M.R.Evid. 403").[5] Framing its ruling, the District Court permitted Quinlan to inquire about each of the five specific instances on cross-examination of S.Q., and to ask whether she had lied on each occasion. It also permitted Quinlan to inquire generally of the other witnesses about S.Q.'s character for untruthfulness but did not permit inquiry about the five instances with other witnesses.

---

[5] See also, Commission Comments to M. R. Evid. 608(b) (citation omitted):
   The subdivision also contains the additional safeguard that the discretion of the court will determine whether a specific instance will be used at all. The court must consider the admissibility of this type of evidence, like any other impeaching evidence, under Rules 401 and 403. The Commission intends to change Montana law only to the extent that specific instances of conduct probative of truthfulness or untruthfulness and weighed by the trial court will be admissible.

¶22    Quinlan argues the District Court erred by not permitting him to inquire further to prove S.Q. was lying.  Specifically, Quinlan argues that, after S.Q. "denied lying" or stated she "did not remember" a specific instance of lying, "the ruling of the Court prevented the defense [from] controverting her responses of cross-examination with extrinsic evidence of those specific lies."  Quinlan elaborates that, "[w]hen faced with an evasive, dishonest, and hostile witness on cross-examination, direct or collateral impeachment is necessary to demonstrate to the jury that the untruthful witness's testimony has no credibility and, therefore, cannot be believed."

¶23    However, Quinlan's position contradicts the text of Rule 608(b).  A witness's denial of having lied in an instance inquired about on cross-examination does not open the door for a party to otherwise prove the lie by extrinsic evidence.  ("Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, may not be proved by extrinsic evidence."  M. R. Evid. 608(b).)  As the State argues, after counsel is permitted to ask a witness about a specific instance of lying on cross-examination, counsel is "stuck with whatever response" the witness gives.  As the Ninth Circuit Court of Appeals explained regarding Rule 608(b) in a case where the government wanted to challenge a witness who had previously feigned cancer:

> [T]he law is clear; the cancer evidence could not properly be admitted to impeach [the witness's] credibility.  Fed. R. Evid. 608(b) provides that "specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility . . . may not be proved by extrinsic evidence."  Under this explicit rule, the government was stuck with whatever response [the witness] gave about her cancer; the government "could attempt on further cross examination to elicit a response . . . contradicting [her] prior

13

testimony, but it could not properly impeach [the witness] through extrinsic evidence." *United States v. Bosley*, 615 F.2d 1274, 1276-77 (9th Cir. 1980).

*United States v. Brooke*, 4 F.3d 1480, 1484 (9th Cir. 1993).

¶24 To be clear, the District Court had authority under Rule 608(b) to permit Quinlan to conduct a more extensive inquiry about the lying incidents during cross-examination of S.Q. than it here permitted. *See Brooke*, 4 F.3d at 1484 (stating that under Rule 608(b), "the government could attempt *on further cross examination* to elicit a response" from the witness acknowledging her prior lying) (emphasis added; internal quotation omitted); *see also Zimmerman*, ¶ 28 (stating that the trial court "should have allowed [the Defendant] to use [the Officer's] reports to challenge his credibility in front of the jury" during cross-examination). However, the District Court limited Quinlan's inquiry based upon the concerns it had expressed about relevance and unfair prejudice under Rule 403, and Quinlan does not specifically challenge the reasons relied upon by the District Court for doing so. Further, Quinlan's argument that the District Court's ruling prevented him from demonstrating S.Q.'s "bias or motive to testify falsely" is overstated; the five instances of lying were unrelated to the charges or to a demonstrable reason S.Q. could have been biased against Quinlan, and thus were instead relevant to S.Q.'s general "character for untruthfulness." *Pelletier*, ¶ 17. As defense counsel argued in closing, "[w]e just don't know what her motivation was for lying. I can tell you Justin didn't do this."

¶25 Lastly, Quinlan asserts that, after S.Q. denied lying, he should have been permitted to offer extrinsic evidence of S.Q.'s lies under M. R. Evid 613(b), arguing "Rule 613(b) also permits extrinsic evidence of a prior inconsistent statement to show that a witness's

14

statement at trial is irreconcilably at odds with the one made previously, thus calling the declarant's credibility into question." However, Quinlan improperly equates a "prior inconsistent statement" with a "prior lie," and misapplies the Rule. S.Q. did not speak in her trial testimony of stealing at school, bullying on the school bus, using the F word, Kyle smacking her, or downloading Instagram. Had she done so, Rule 613(b) would have permitted inquiry into any of her prior inconsistent statements about those incidents. In short, Quinlan claimed S.Q. had lied in the past, not that she lied or otherwise spoke inconsistently at trial. Rather, S.Q. merely testified that she had not lied in, or did not remember, those incidents, and, thus, her testimony did not provide a basis for introduction of extrinsic evidence about those incidents to establish the prior falsehoods as "prior inconsistent statements."

¶26    We conclude the District Court did not misapply the Rules or abuse its discretion in its ruling on the admissibility of evidence.

¶27    *2.    Did the District Court's evidentiary ruling violate Quinlan's right to confrontation under the Sixth Amendment to the United States Constitution and Article II, § 24, of the Montana Constitution?*

¶28    Quinlan also challenges the District Court's evidentiary ruling on constitutional grounds.[6] He argues the ruling violated his right to confrontation under the Sixth Amendment of the United States Constitution and Article II, § 24, of the Montana Constitution by limiting his questioning and introduction of extrinsic evidence to impeach

---

[6] In response to the State's motion in limine, Quinlan raised an objection based upon the constitutional confrontation right, and thus preserved the issue for appeal. *See State v. Bonamarte*, 2009 MT 243, ¶ 16, 351 Mont. 419, 213 P.3d 457.

15

S.Q.'s credibility and truthfulness, thereby undermining his ability to demonstrate S.Q.'s bias, prejudice, or motives in testifying against him. The State responds that Quinlan's confrontation rights were fully realized by the allowances made by the District Court for his inquiries into S.Q.'s lies on her cross-examination, and inquiries about S.Q.'s truthfulness in cross-examination of the other witnesses.

¶29 Persons accused of a crime hold a fundamental right to be confronted by witnesses against them. U.S. Const. amnd. VI; Mont. Const. art. II, § 24; *Pointer v. Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 1068 (1965) (holding that the confrontation right, under the Sixth Amendment of the United States Constitution, is fundamental and thus obligatory on the states via the Fourteenth Amendment). To ensure that "evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings," confrontation requires: "physical presence of the witness, testimony under oath, cross-examination of the witness, and observation of the witness's demeanor by the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 846, 110 S. Ct. 3157, 3163 (1990); *State v. Stock*, 2011 MT 131, ¶ 23, 361 Mont. 1, 256 P.3d 899.

¶30 Importantly, "though a defendant's right to confront and cross-examine an adverse witness is grounded in the Sixth Amendment to the United States Constitution, and Article II, Section 24, of the Montana Constitution, a trial court has broad discretion to limit the scope of cross-examination to those issues it determines are relevant to the trial." *State v. Nelson*, 2002 MT 122, ¶ 15, 310 Mont. 71, 48 P.3d 739 (citations omitted). "Moreover, limiting the scope of cross-examination does not necessarily violate a

16

defendant's right to confront an adverse witness." *Nelson*, ¶ 15 (citation omitted). "[W]e have clearly stated that the Confrontation Clause 'guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *State v. Wagner*, 2013 MT 47, ¶ 37, 369 Mont. 139, 296 P.3d 1142 (citing *State v. Skinner*, 2007 MT 175, ¶ 31, 338 Mont. 197, 163 P.3d 399) (emphasis in original). "Trial judges 'retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on [] cross-examination . . . .'" *Wagner*, ¶ 37 (citing *State v. Wilson*, 2007 MT 327, ¶ 45, 340 Mont. 191, 172 P.3d 1264. However, a trial court's discretion "becomes operative only after the constitutionally required threshold level of inquiry has been afforded the Defendant." *Nelson*, ¶ 13 (citing *State v. Gommenginger*, 242 Mont. 265, 274, 790 P.2d 460, 461 (1990)).

¶31 First, Quinlan was provided with the hallmark elements of the confrontation right regarding S.Q., including the physical presence of S.Q., her testimony under oath, cross-examination of S.Q., and observation of S.Q.'s demeanor by the trier of fact, as well as for the other witnesses. *See Craig*, 497 U.S. at 846, 110 S. Ct. at 3163. His opportunity to cross-examine S.Q. was extensive, permitting questioning beyond the issues discussed in this appeal, such as the letter S.Q. wrote recanting her allegations against Quinlan, the strained relationship between Quinlan and Heather, S.Q.'s direct knowledge of Quinlan's infidelity, and S.Q.'s frustrations with her relationship with Quinlan. Based upon its stated Rule 403 concerns, which Quinlan does not challenge, the District Court placed parameters upon, but permitted, Quinlan's questioning of S.Q. about five instances of prior lying, and

his questioning of other witnesses about S.Q.'s untruthfulness. The instances Quinlan sought to inquire into further were largely childish untruths that bore no demonstrated relation to S.Q.'s allegations against or relationship with Quinlan. Therefore, we conclude the District Court clearly afforded Quinlan the "constitutionally required threshold level of inquiry," *Nelson*, ¶ 13 (citation omitted), and properly exercised its discretion by imposing reasonable limits on Quinlan's evidentiary inquiries.

¶32    Affirmed.


                                                    /S/ JIM RICE

We concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR
/S/ INGRID GUSTAFSON