FILED

05/26/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0586

DA 23-0586

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2026 MT 113

STATE OF MONTANA,

      Plaintiff and Appellee,

v.

SEBASTIAN NATHANIEL BELCOURT,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. CDC-22-27
Honorable John A. Kutzman, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Gregory E. Paskell, Attorney at Law, Lynnwood, Washington

      For Appellee:

      Austin Knudsen, Montana Attorney General, Mardell Ployhar, Assistant Attorney General, Helena, Montana

      Joshua A. Racki, Cascade County Attorney, Angela D. Payne, John Brothers, Deputy County Attorneys, Great Falls, Montana

Submitted on Briefs: March 25, 2026

Decided:  May 26, 2026

Filed:

      _____
                  Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Sebastian Nathaniel Belcourt (Belcourt) appeals the August 9, 2023 Judgment entered in the Eighth Judicial District Court, Cascade County, imposing a five-year sentence to the Montana State Prison and two six-month sentences to county detention for his convictions of strangulation of a partner or family member, unlawful restraint, and resisting arrest. On appeal, Belcourt maintains the District Court erred when it prevented him from introducing evidence of the victim's Internet history to show he did not have the requisite mental state to commit the offense of strangulation of a partner or family member under § 45-5-215(1), MCA. More specifically, Belcourt argues that he strangled the victim to sexually arouse her rather than to impede her air or blood flow as the statute requires. Prior to trial, Belcourt moved the court for a ruling on the admissibility of the Internet history evidence. The District Court denied Belcourt's motion in limine on March 18, 2023. We affirm.

¶2 We restate the issue on appeal as follows:

*Whether the District Court abused its discretion when it excluded evidence under Mont. R. Evid. 403 of the victim's Internet history.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 This case stems from a neighbor's report in January 2022 of a violent disturbance in an apartment in Great Falls, Montana. Three officers responded to the report and made contact with Belcourt at the door of his apartment unit. Officers Stephanie Kazior and Nolan Vaughan noticed that Belcourt had dried blood on his hands. Belcourt denied that there was an argument, only a "heated conversation." When Officer Kazior asked who

2

else was in the apartment, Belcourt said R.A., who stepped out into the hallway to talk to Officers Kevin Kelsey and Nolan Vaughan.  R.A. had a deep gash on her chin, and her face was covered in small injuries, including some swelling around her eyes and nose and scratch marks under her eye.  R.A. later received stitches on her chin for her injury.  R.A. also had redness and scratches on her neck.  R.A. was shaky and teary-eyed and reluctant to speak in the presence of Belcourt, with whom she was involved in an approximately six-year intimate relationship.

¶4    Once out of the presence of Belcourt, R.A. recounted a series of escalating incidents of domestic violence over a three-day period.  R.A. explained that the scratches to her face were caused two days earlier when Belcourt punched and broke a car window causing shattered glass to cut her face.  Later that night, while she was sleeping next to the parties' infant daughter, Belcourt grabbed R.A. by the throat, which impeded her breathing and woke her up.  R.A. escaped barefoot in 30 degrees below zero weather to a nearby gas station where she called Belcourt's uncle, Howie, who picked her up.  Howie and R.A. drove around for a few hours before R.A. ultimately decided to return to her unattended daughter because her "safety was second to that" of her daughter.  R.A. later tried to leave the home with the parties' daughter multiple times but was prevented from doing so by Belcourt, who by then had taken her keys.  The incidents of domestic violence escalated again in the evening when Belcourt struck R.A. in her nose with his knee several times causing pain and profuse bleeding.  Finally, R.A. disclosed that Belcourt had grabbed her by the throat a second time, which impeded the passage of air and blood and caused her to lose consciousness.  Belcourt bent her in a way that made her think he was trying to break

3

her neck. R.A. passed out during the struggle and Belcourt then threw R.A. against a lamp, causing the gash on her chin. When she regained consciousness, R.A. fled the apartment down three flights of stairs where she hid in a dryer in the laundry room. Upon hearing a door close and believing that Belcourt had left, R.A. crawled out of the dryer and started up the stairs. However, Belcourt was waiting for her at the edge of the stairway, and he grabbed her by the hair and dragged her back into the apartment. R.A. reported that Belcourt threatened her life and told her, "Nobody's going to have you because you have made this decision." Several neighbors confirmed that they heard arguing and banging coming from the parties' apartment and that this was a common occurrence between R.A. and Belcourt.

¶5      The State charged Belcourt with several offenses related to this extended period of acute domestic violence and Belcourt's subsequent arrest. After amending the charges, the State proceeded to jury trial on charges of strangulation, assault on a peace officer, unlawful restraint, and resisting arrest. Belcourt moved the District Court for an order in limine permitting him to introduce certain evidence related to R.A.'s Internet history based on his defense that R.A. consented to the strangulation during sexual intercourse. Specifically, Belcourt sought to introduce evidence under an exception to Montana's Rape Shield Statute of R.A.'s interest in unconventional sexual acts often referred to as BDSM (bondage, discipline, sadism, and masochism). Anticipating that R.A. would deny engaging in such acts, Belcourt sought to introduce evidence of R.A.'s alleged use of adult content social media websites, Fansly and FetLife. Fansly is a for-profit website where individuals can sell adult content to subscribers. FetLife is a social networking website

4

oriented toward people interested in unconventional sexual acts such as BDSM. An account which Belcourt alleged was managed by R.A. indicated an interest in collars, restraints, submission, discipline, and other sexual fetishes. Critically, strangulation did not appear as an indicated interest in the exhibits that Belcourt proffered. The State countered that this proffered evidence was irrelevant because it did not show that R.A. had an interest in strangulation; that both websites are solely for online content, not for facilitating in-person contact; that the evidence was more prejudicial than probative and would only humiliate the victim; and that it did not fit under any exception to the Rape Shield Statute.

¶6     The District Court denied Belcourt's motion, expressing its doubt that the Rape Shield Statute even applied after noting that by its express terms, the Rape Shield Statute applies to "prosecutions under this part" (i.e., Title 45, Chapter 5, Part 5 which addresses sex offenses). Section 45-5-511(2), MCA. Instead, the District Court concluded that Rule 403 imposed a similar balancing analysis as the Rape Shield Statute as it required the court to consider the prejudicial impact of the Internet history evidence against Belcourt's right to a fair trial and opportunity to discredit R.A. The District Court reasoned that because Belcourt's defense theory would seek to negate the mental state element, only evidence showing that Belcourt knew that R.A. was aroused by strangulation would be relevant and not other nonconventional sexual acts. The court further reasoned that because the websites were subscription-based, R.A. had an economic incentive to indicate a wide variety of sexual interests. Noting that such evidence would be highly prejudicial to the victim, the District Court permitted Belcourt to examine R.A. on whether she had told

5

Belcourt that she was sexually interested in being strangled or that she had previously permitted him to strangle her or otherwise manifested consent to such conduct. Beyond these lines of inquiry, the District Court held that the introduction of R.A.'s alleged use of Fansly and FetLife was not relevant to whether R.A. consented to being strangled.

¶7 A jury convicted Belcourt of strangulation of a partner, unlawful restraint, and resisting arrest. Belcourt now appeals.

## STANDARD OF REVIEW

¶8 "A district court has broad discretion to determine the admissibility of evidence and we generally review evidentiary rules for an abuse of discretion." *State v. Twardoski*, 2021 MT 179, ¶ 14, 405 Mont. 43, 491 P.3d 711. A district court abuses its discretion if it "acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice." *State v. Hicks*, 2013 MT 50, ¶ 14, 369 Mont. 165, 296 P.3d 1149 (quoting *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811). Although a district court exercises broad discretion when determining the relevancy and admissibility of evidence, it is still bound by the Rules of Evidence and applicable statutes and constitutional protections when exercising its discretion. *Derbyshire*, ¶ 19 (quoting *State v. Mizenko*, 2006 MT 11, ¶ 8, 330 Mont. 299, 127 P.3d 458). We therefore review for correctness when a district court's evidentiary ruling is based on its interpretation of the Rules of Evidence, a statute, or the constitution. *Derbyshire*, ¶ 19 (citations omitted).

6

**DISCUSSION**

¶9 On appeal Belcourt argues that the District Court ultimately considered his motion under the Rape Shield Statute, which was structural error because it only applies to sex crimes and strangulation is an assault-related offense. Belcourt further contends that the proffered evidence was relevant and probative and not unfairly prejudicial because selling online adult content and strangulation are both "sensational and disturbing" and "the evidence is no worse than the crime charged." Belcourt asserts that the District Court's denial of his motion in limine to introduce evidence of R.A.'s Internet history denied him his right to confront and cross-examine his accuser. The State points out that the District Court did not apply the Rape Shield Statute and responds that the evidence of R.A.'s Internet history was not relevant and even if it had a modicum of relevancy its probative value substantially outweighed the danger of unfair prejudice and confusion of the issues. We agree with the State.

¶10 "Persons accused of a crime hold a fundamental right to be confronted by witnesses against them." *State v. Quinlan*, 2021 MT 15, ¶ 29, 403 Mont. 91, 479 P.3d 982 (citing U.S. Const. amnd. VI; Mont. Const. art. II, § 24; *Pointer v. Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 1068 (1965)). Although a criminal defendant's right to confront and cross-examine an adverse witness is grounded in the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution, trial courts exercise broad discretion to limit the scope of cross-examination to those issues it determines are relevant to the trial. *Quinlan*, ¶ 30. We have said, "limiting the scope of cross-examination does not necessarily violate a defendant's right to confront an adverse witness." *Quinlan*,

7

¶ 30 (quoting *State v. Nelson*, 2002 MT 122, ¶ 15, 310 Mont. 71, 48 P.3d 739). "[W]e have clearly stated that the Confrontation Clause 'guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Quinlan*, ¶ 30 (quoting *State v. Wagner*, 2013 MT 47, ¶ 37, 369 Mont. 139, 296 P.3d 1142) (emphasis in original; citation omitted). In general, relevant evidence is admissible. *Twardoski*, ¶ 29 (quoting M. R. Evid. 402). "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M. R. Evid. 401. Relevancy is not the only consideration as M. R. Evid. 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

¶11 Here, the District Court properly limited Belcourt's proffered line of questioning to relevant evidence regarding his knowledge of R.A.'s alleged interest in strangulation.[1] The court provided permissible examples of cross-examination, such as whether R.A. had previously *told* Belcourt she was sexually interested in being strangled or that she had previously *permitted* him to strangle her in connection with one or more sex acts or had *otherwise manifested consent or arousal* when he did so. This line of cross-examination would have been relevant to Belcourt's mental state based on his defense theory that he

---

[1] At trial, Belcourt's counsel did not cross-examine R.A. on this matter.

grabbed R.A. by the throat to arouse her and not to impede her breathing. However, evidence of R.A.'s alleged interest in collars, restraints, submission, or other unconventional sex acts was not relevant to Belcourt's defense or to impeach R.A.

¶12 The District Court properly distinguished between Belcourt's possible knowledge of R.A.'s alleged interest in strangulation and R.A.'s alleged interest in other, non-relevant sex acts. Belcourt was not alleged to have put R.A. in a collar or some other nonconventional sex act. He was alleged, and convicted, of strangling R.A. to the point of causing her to lose consciousness. Not only did evidence of R.A.'s Internet history have minimal, if any, probative value as to Belcourt's mental state, it risked unfairly prejudicing R.A.'s testimony and confusing the issues. The evidence would have put R.A. on trial for her alleged sexual interests and added confusion to the underlying issue. The District Court was correct to be wary that such evidence was intended to disparage R.A. The relevant facts at issue were whether Belcourt purposely or knowingly impeded the normal breathing or circulation of R.A.'s blood, not R.A.'s alleged interests in nonconventional sex acts. Finally, we reject Belcourt's argument that equates strangulation of a partner or family member—which the Legislature has codified as a felony offense—to nonconventional, yet consensual sex acts.

¶13 Belcourt was granted the opportunity to introduce evidence tending to negate he had the requisite mental state when he committed the offense of strangulation and, therefore, his constitutional right of confrontation was not violated. Accordingly, the District Court did not abuse its discretion when it limited Belcourt's proffered cross-examination of R.A. to Belcourt's knowledge that she may have been interested in strangulation. Finally, the

9

District Court's ruling did not constitute structural error. Structural error is reserved for defects affecting the framework within which the trial proceeds. *State v. Van Kirk*, 2001 MT 184, ¶¶ 38-40, 306 Mont. 215, 32 P.3d 735. The ruling here was an evidentiary limitation under Rules 401 and 403. Belcourt remained free to cross-examine R.A. about whether she had communicated to him an interest in strangulation or had previously manifested consent or arousal when he strangled her in a sexual context. The court excluded only generalized Internet history evidence that did not include strangulation and did not establish Belcourt's knowledge. Because the ruling did not deprive Belcourt of the opportunity to present his defense, it was not structural error.

**CONCLUSION**

¶14 Evidence of R.A.'s alleged interest in nonconventional sex acts was not relevant to whether Belcourt committed the offense of strangulation when he grabbed R.A. by the throat and caused her to lose consciousness. The District Court did not abuse its discretion when it limited Belcourt's proffered line of cross-examination only to his knowledge of R.A.'s alleged interest in strangulation.

¶15 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ CORY J. SWANSON
/S/ KATHERINE M. BIDEGARAY
/S/ BETH BAKER
/S/ INGRID GUSTAFSON

10