116 P.3d 431 (2005)
STATE of Washington, Respondent,
v.
Brian Leonard McSORLEY, Defendant.
No. 31297-2-II.
Court of Appeals of Washington, Division Two.
July 26, 2005.
*432 Donna Yumiko Masumoto, Attorney at Law, Tacoma, WA, for Respondent.
Rita Joan Griffith, Attorney at Law, Seattle, WA, for Appellant.
MORGAN, J.
¶ 1 Brian L. McSorley appeals his conviction for child luring. Through counsel, he claims that the trial court erred by instructing on an affirmative defense at the State's request and over his objection. Pro se, he claims that he received ineffective assistance from his trial counsel. Agreeing on both counts, we reverse and remand for new trial.
¶ 2 On the morning of May 21, 2003, D.J., then age ten, was waiting for his school bus at the end of his driveway. He saw a red *433 Jeep pickup "drive down the road a couple times."[1] He did not know the man behind the wheel.
¶ 3 The pickup returned and stopped. The man opened his door and said something that sounded like, "Get in the truck."[2] According to, D.J.'s later testimony, "I didn't hear one of the words that he said. It pretty much sounded like, Get in the truck, or I'll hurt you, but it sounded  I heard, Get in the truck, or and then hurt you."[3] D.J. could not see the man's "whole face," as the man "wasn't looking at [him]."[4] D.J. ran back to his house and found his mother. He was upset, crying, and yelling that "some man pulled over and said to get in his truck or he was going to hurt" him.[5]
¶ 4 His mother walked him back to the school bus, which was then just arriving. He got on, told the driver what had happened, and was looking out the window when he saw the red Jeep pickup drive by again. The bus driver could not get the license number, but he had the school bus dispatcher broadcast the pickup's description over the school bus radio.
¶ 5 A second school bus driver was picking up students a short distance away when she saw a red Jeep pickup matching the description she had just heard over the radio. The pickup pulled into the parking lot of a post office, and the driver, a man, went into the post office. The bus driver pulled in behind the truck, obtained its license number, and notified the school bus dispatcher, who in turn notified the police.
¶ 6 Deputy Waterman heard over the police radio that a man who had tried to lure a child was driving a rust-colored Jeep pickup. Waterman spotted a matching vehicle, stopped it, and had the driver, McSorley, step out. He read McSorley his rights, to which McSorley "didn't respond. He just sat there."[6] Waterman then asked McSorley what had happened that morning, and McSorley answered that "he was going to a doctor's office visit" and had "stopped at the post office."[7] McSorley admitted having driven past a school bus stop, but he denied talking to any children.
¶ 7 While Waterman was talking to McSorley, Deputy Donato was interviewing D.J. at school. D.J. gave a description that matched McSorley, so Waterman arrested McSorley.
¶ 8 On May 23, 2003, the State charged McSorley with child luring in violation of RCW 9A.40.090. RCW 9A.40.090 provides in pertinent part:
A person commits the crime of luring if the person:
(1)(a) Orders, lures, or attempts to lure a minor . . . into a motor vehicle;
(b) Does not have the consent of the minor's parent or guardian . . .; and
(c) Is unknown to the child . . .
(2) It is a defense to luring, which the defendant must prove by a preponderance of the evidence, that the defendant's actions were reasonable under the circumstances and the defendant did not have any intent to harm the health, safety, or welfare of the minor.
Subsection (3)(a) defines a "minor" as a person under sixteen, and subsection (4) classifies the crime of luring as a Class C felony.
¶ 9 On November 18, 2003, the State moved in limine to exclude two prior "pranks"[8] by D.J. In one instance, D.J. gestured "wildly" for a passing car to stop.[9] The driver stopped, ran to help, and was "met with a torrent of profanity and laughs from [D.J.'s] friends hiding in the bushes."[10] In the other instance, D.J. lay in the road with his bike, as if he had just been involved in a bike accident. When a driver stopped *434 and ran to help, D.J. "jumped up, laughed, and did a little dance."[11] McSorley argued that he was entitled to cross-examine D.J. about both of these incidents and, if D.J. denied them, to call witnesses who would describe them. The trial court excluded both incidents.
¶ 10 On November 19, 2003, a jury trial started. D.J. identified McSorley on direct examination. But when asked on cross whether McSorley was "the same person that told you to get into the car," he said, "I don't know."[12]
¶ 11 During the State's case in chief, Detective Dogeagle testified that he had contacted Group Health to find out when McSorley's medical appointment was. According to Dogeagle's understanding, someone there had said that the appointment was not in the morning, but rather at 3:30 P.M. Much later, several weeks after verdict, the doctor's office said in writing that the appointment was at 10:30 A.M.
¶ 12 Taking the stand on his own behalf, McSorley said that on the morning of May 21, he intended to go to a morning doctor's appointment and run errands. He left home about 8 A.M. but soon realized he had forgotten his glucometer.[13] He returned home to get it, so he twice drove past D.J.'s bus stop. He had seen D.J. at the bus stop, but he had not spoken to him. After retrieving the glucometer, he stopped at the post office.
¶ 13 When testimony ended, the State requested Instruction 5, which was based on RCW 9A.40.090(1), and Instruction 6, which was based on RCW 9A.40.090(2). Instruction 6 stated:
It is a defense to a charge of luring that:
(1) The defendant's actions were reasonable under the circumstances; and
(2) The defendant did not have any intent to harm the health, safety, or welfare of the minor.
This defense must be established by a preponderance of the evidence. Preponderance of the evidence means that you must be persuaded, considering all the evidence in the case, that it is more probably true than not true. If you find that the defendant has established this defense, it will be your duty to return a verdict of not guilty.[[14]]
McSorley "most strenuously" objected to Instruction 6, in essence asserting that he had the right to control his defense, that the State could not force him to raise or rely on an affirmative defense, and that Instruction 6 would confuse the jury by imposing on him the burden of proving facts not in issue.[15] The trial court overruled and gave Instruction 6.
¶ 14 On November 21, 2003, the jury found McSorley guilty. On December 26, 2003, McSorley orally moved for a new trial. The court denied the motion and imposed a sentence of six months in jail.

I.
¶ 15 McSorley argues that the trial court should not have given Instruction 6. He argues that the State had no right to compel him to rely on an affirmative defense, and that Instruction 6 imposed on him the burden of proving facts not in issue and on which there was no evidence.
¶ 16 In State v. Jones,[16] the Washington Supreme Court considered whether a trial court could compel a defendant to raise and rely on the affirmative defense of insanity. Answering in the negative, the Jones court expressly recognized that every competent defendant "has a constitutional right to at least broadly control his own defense."[17] Reasoning that a defendant's right to raise or waive the defense of insanity should be no different from a defendant's right to assert or waive other defenses like alibi or self defense, the Jones court observed that *435 "courts do not impose these other defenses on unwilling defendants."[18] Reasoning from Faretta v. California,[19] in which the United States Supreme Court held that "the California courts [had] deprived [Faretta] of his constitutional right to conduct his own defense" when they had refused to accept his knowing and voluntary choice to represent himself rather than to have counsel,[20] the Jones court stated:
The language and reasoning of Faretta necessarily imply a right to personally control one's own defense. In particular, Faretta embodies "the conviction that a defendant has the right to decide, within limits, the type of defense he wishes to mount."[[21]]
Reasoning from North Carolina v. Alford,[22] in which the United States Supreme Court held that the North Carolina courts had properly permitted Alford to plead guilty (and thus to waive all possible defenses) based on the State's evidence rather than his own admission of guilt, the Jones court commented that "[courts] should not force any defense on a defendant in a criminal case."[23]
¶ 17 Based on Jones, Faretta, and Alford, and assuming without deciding that RCW 9A.40.090 is constitutional,[24] we hold that neither the State nor the trial court may compel a defendant to raise or rely on the affirmative defense stated in RCW 9A.40.090(2), and that the trial court erred by giving Instruction 6 over McSorley's objection. Hence, a new trial is required.[25]

II.
¶ 18 Pro se, McSorley argues that trial counsel rendered ineffective assistance by not showing when his medical appointment was, and by not objecting when the State proposed to show, apparently incorrectly, when it was. He complains that by not talking to his doctor before trial, by not objecting to Dogeagle's hearsay, and by not seeking a short continuance to verify what Dogeagle said, defense counsel failed to present and argue accurate information, and allowed the State to present inaccurate information.
¶ 19 During the State's case in chief, Detective Dogeagle testified, without objection from defense counsel, that he had spoken to Group Health about whether McSorley had a doctor's appointment on May 21. He stated:
Q: . . . Detective, did you do any additional investigation on this case?
A: Yes.
Q: And what is that?
A: I contacted Group Health a couple days ago to find out if Mr. McSorley had an appointment on the date of the [] incident.
Q: And did he?
A: Yes, he did, for 3:30 in the afternoon.
Q: And where was that appointment?
A: I believe the Puyallup office of Group Health with a Dr. Duncan.[[26]]
¶ 20 During the defense case in chief, McSorley testified that his doctor's appointment had been in the morning, not the afternoon. Using Dogeagle's earlier testimony to which the defense had not objected, the prosecutor was then able to pit McSorley's credibility *436 against Dogeagle's. The prosecutor asked and McSorley answered:
Q: And your doctor's appointment is 3:30; is that correct?
A: I believe Mr. Dogeagle is mistaken about that. I think I had a 3:30 doctor's appointment shortly after I got out of jail.
Q: Detective Dogeagle said on May 21st, this day in question, you had an appointment with Dr. Duncan at 3:30 p.m; is that correct?
A: I believe he is mistaken about that. I'm sure it was in the morning.
Q: Do you have anything that indicates it was in the morning and he is mistaken?
A: Not on me, no.
Q: Can you get us that, please?
[Defense counsel]: Object to the state shifting the burden here. The state has had six months to research this case.
[Prosecutor]: Detective Dogeagle did research it. He is saying the detective is mistaken, I'm asking if he has anything to support that allegation.
The Court: Overruled.
[Defense counsel]: Then asked and answered. He said he doesn't have anything on him.
Q [by the prosecutor]: I'm asking if you have anything at all to support your contention that Detective Dogeagle is mistaken?
A: No, I do not.[[27]]
¶ 21 During closing arguments, the prosecutor used the timing of the medical appointment to again pit McSorley's credibility against Dogeagle's, to argue that McSorley was knowingly being untruthful about his medical appointment, and to claim that McSorley had failed to explain why he was out driving around on the morning in question because he had not accounted for a time gap of six hours. Asserting that McSorley had been "cagey and evasive"[28] on the witness stand, the prosecutor told the jury:
[Prosecutor]: . . . An[] example of that is the doctor appointment. Detective Dogeagle, it's his job as a detective to find out when that doctor's appointment was, and he told you: 3:30 in Puyallup Group Health, Dr. Duncan. The defendant gets up there and says, Well, I don't know. I think it was in the morning. He is kind of vague about that too. He is not going to really commit, but he has got nothing to support that contention. He knows his doctor appointment was in the afternoon, and he has got six hours to explain.
[Defense counsel]: I'm going to object, Your Honor. He is shifting the burden. It's the state's duty to prove the guilt of my client. It's not my client's duty to prove his innocence.
[Prosecutor]: I'm arguing the evidence, Your Honor.
[Defense counsel]: No, it's mischaracterizing the evidence.
The Court: Overruled.
[Prosecutor]: Thank you, Your Honor.
It's up to you to decide if that's an accurate recitation of the evidence. You heard Detective Dogeagle. It's his job to find out when that doctor's appointment was. The defendant knows he has been charged with this for quite some time. He knows there is a trial going on. He knows his appointment is 
[Defense counsel]: Shifting the burden, Your Honor.
[Prosecutor]: He knows his appointment is later in the afternoon, and now he kind of shifts, to, Well, I think it was in the morning. But he won't commit to the fact that it was in the morning because he knows it can't be shown that it was in the morning because his doctor's appointment was exactly when Deputy Dogeagle told you it was, which is 3:30 in the afternoon, and we have got this time gap where the defendant is cruising around, going by school bus stops.[[29]]
During the defense closing argument, counsel responded weakly, "We have nothing direct from the doctor's office, and that's what *437 we need for proof beyond a reasonable doubt."[30]
¶ 22 Two or three weeks after verdict, defense counsel orally told the prosecutor "that he may be moving for a new trial,"[31] but he never filed a written motion to that effect. At sentencing on December 26, 2003, defense counsel began by handing the court a fax from the office of McSorley's doctor, Dr. Duncan. The fax stated that McSorley's May 21 medical appointment was for 10:30 A.M. Although defense counsel neglected even then to file the fax in the record of the court, the State candidly acknowledged it was "not doubting the [fax's] authenticity."[32] Based on the fax, defense counsel orally moved for a new trial. The State responded that it had not been served with an affidavit showing that the fax met the criteria for newly discovered evidence. The trial court denied a new trial and sentenced McSorley to six months in jail.
¶ 23 To prove ineffective assistance, McSorley must show both deficient performance and resulting prejudice.[33] Performance is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness.[34] Prejudice exists if the outcome of the trial would have been different but for counsel's deficiencies.[35]
¶ 24 Counsel's performance here was deficient. A key question at trial was whether McSorley was out driving around on the morning of May 21 looking for a child to molest, or whether he was running errands before going to a mid-morning medical appointment. Counsel complying with an objective standard of reasonableness would have contacted someone at the doctor's office before trial, not after trial, to document the time at which McSorley was due to arrive there. Failing that, counsel would have made a hearsay objection when Dogeagle offered the out-of-court statement of someone in the doctor's office to prove the truth of the fact that McSorley was not due there until 3:30. Failing that, counsel would have sought a brief continuance to speak with the doctor's office and discovered then what he later learned in the fax. Failing that, counsel would at least have filed the tardily-obtained fax in the record of the court, rather than relying on the State's acknowledgment of authenticity. In not doing any of these things, counsel fell below an objective standard of reasonableness.
¶ 25 This deficient performance was prejudicial for several reasons. First, the deficient performance unnecessarily exposed McSorley to cross-examination that persuasively implied he had not documented the time of his medical appointment because he was lying about it. Second, the deficient performance permitted the detective to relate hearsay which, according to later information from the doctor's office, was inaccurate. Third, the deficient performance cast defense counsel into the position of unnecessarily and ineffectually objecting that the State was shifting the burden of proof; the need for that objection arose only because counsel had failed to contact the doctor before trial and/or voice a hearsay objection to Dogeagle's testimony. Fourth and most importantly, counsel's deficiencies allowed the prosecutor, during closing arguments, to pit McSorley's credibility against that of an experienced police detective, to assert that McSorley was knowingly being untruthful about when his appointment was, and to claim that McSorley's testimony failed to explain a six-hour time gap. The trial was mainly a credibility contest between D.J. and McSorley, and we cannot say that its outcome would have been the same in the absence of these deficiencies. We conclude that counsel rendered ineffective assistance and that a new trial is required.

*438 III.
¶ 26 Citing ER 608(b) and several Washington cases that construe it, McSorley argues that "the trial court erred in denying [him] the right to cross examine D.J. about prior specific instances of conduct which were probative of truthfulness or untruthfulness."[36] The State responds in part that the record does not show when either incident occurred. McSorley does not assign error to the trial court's exclusion of extrinsic evidence (as opposed to evidence adduced on cross), so we do not address that matter herein.[37]
¶ 27 Preliminarily, we review the trial court's prohibition on cross-examination only because it is likely to arise on remand. Under ER 103(a), error may not be predicated on a ruling that excludes evidence unless a substantial right of the party is affected and the substance of the evidence was made known to the trial court by an offer of proof. The record here does not show an offer of proof or what the substance of D.J.'s answers would have been if the trial court had permitted the requested cross-examination. We address this issue only because we are reversing on other grounds.
¶ 28 Turning to the merits of the issue, ER 404(a) bars evidence that uses a person's propensities to show how the person acted on a particular occasion, subject to the exceptions set forth in ER 404(a)(1), (a)(2), and (a)(3). The exception pertinent here, ER 404(a)(3), permits propensity-based "[e]vidence of the character of a witness, as provided in [ER] 607, 608, and 609."[38] ER 607 and ER 609 are not involved here, but ER 608 is. ER 608(b) provides:
Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
¶ 29 In State v. Clark,[39] the defendant wanted to impeach a State's witness named Hillius. After noting that a trial court generally has discretion, and that an appellate court reviews only for abuse of that discretion, the Clark court said:
Failing to allow cross-examination of a state's witness under ER 608(b) is an abuse of discretion if the witness is crucial and the alleged misconduct constitutes the only available impeachment. State v. York, 28 Wash.App. 33, 621 P.2d 784 (1980). The need for cross-examination on misconduct diminishes with the significance of the witness in the state's case. Once impeached, there is less need for further impeachment on cross-examination.[[40]]
Because the defendant had successfully utilized ER 609 to show Hillius' 36 prior convictions, and "the misconduct underlying some of those convictions would not be any more probative,"[41] the Clark court concluded that the trial court had not abused its discretion.
¶ 30 As just seen, the Clark court cited State v. York[42] with approval. In York, the defendant was tried for selling marijuana. The person to whom the defendant had allegedly *439 sold, a paid informant named Smith, was the only State's witness with knowledge of the sale. The defendant wanted to elicit, by cross-examining Smith, that Smith had been fired as a sheriff's trainee "because of irregularities in his paper work procedures, and his general unsuitability for the job."[43] The State moved in limine to preclude this, and the trial court granted the motion. As a result, the prosecutor was able to argue during closing:
There's no reason at all to doubt the testimony of Gary Smith. Absolutely no reason at all. He has no axe to grind. He has no stake in the outcome.[[44]]
After quoting ER 608(b), Division Three said:
Normally, matters of trial court discretion are reviewed by a standard which requires this court to find that no reasonable man would have taken the action pursued by the trial court. But in a criminal case, to allow the defendant no cross-examination into an important area is an abuse of discretion. It is well established that a criminal defendant is given extra latitude in cross-examination to show motive or credibility, especially when the particular prosecution witness is essential to the State's case. Any fact which goes to the trustworthiness of the witness may be elicited if it is germane to the issue.
A criminal defendant's right to cross-examine witnesses against him is a fundamental constitutional right. This right is not absolute and may in appropriate cases bow to other legitimate interests in the criminal process; but denial or diminution calls into question the integrity of the fact-finding process and requires the competing interests be closely examined.[[45]]
Concluding that "the defense should have been allowed to bring out the only negative characteristics of the one most important witness,"[46] and finding that the trial court had abused its discretion, Division Three reversed and remanded for a new trial.
¶ 31 Subject to one possible exception, this case fits within Clark's description of York and York itself. D.J. was a "crucial"[47] witness who was "essential to the State's case,"[48] as he was the only State's witness with direct knowledge of the charged event. His prior "pranks"  if they were not too remote in time  were highly probative of his credibility at trial, both because they showed a willingness to mislead strangers, albeit through nonverbal conduct, and because they "constitute[d] the only available impeachment."[49] Only because of their exclusion was the prosecutor able to assert in closing argument, without controversion, that D.J. "is not one of these ten-year-olds who is going to say things that aren't true or is going to say things just because they have been suggested to him . . . He takes it seriously, and he tells the truth."[50]
¶ 32 The possible exception, as the State correctly points out, is that the record does not show when the two "pranks" occurred. If McSorley shows after remand that one or both "pranks" are not too remote in time, York applies, and he shall be entitled to cross-examine accordingly. But if he does not so show, the "pranks" may again be excluded.

IV.
¶ 33 McSorley argues that the prosecutor improperly commented on his right to remain silent. Again, we review because we are reversing on other grounds and the issue seems likely to arise on remand.
*440 ¶ 34 During the State's case in chief, the prosecutor questioned Deputy Waterman with the following results:
Q: Did you read him his Miranda rights?
A: Yes, I did.
Q: Did he indicate he understood?
A: Yes.
Q: After you read him his rights, did you tell him again why you were detaining him?
A. Yes, I did.
Q: What did he respond?
A: He didn't respond. He just sat there.
Q: Did you ask him anything?
A: I asked him what happened this morning, if he wanted to tell me anything.
Q: And what did he say?
A: He said he was going to a doctor's office visit.
Q: What did you ask next?
A: I told him I thought he was leaving something out. And he said, Oh, I stopped at the post office in Home.
Q: What did you say next?
A: I told him that he was still under investigation for child luring and that I needed to confer with another deputy.[[51]]
Then, during closing argument, the prosecutor told the jury:
I'm going to go back to that conversation the defendant had with Deputy Waterman.
Waterman tells him he is being detained or arrested for child luring. The defendant doesn't ask what that is or who is accusing him. The deputy keeps going. Why don't you tell me what you were doing this morning? He says, I was on my way to the doctor's office. That's it. That's all he gives him. Deputy Waterman says, I think you are leaving some things out here. The defendant says, Well, I stopped at the post office. That's it. He doesn't give him any more.[[52]]
Moments later, the prosecutor said:
And the defendant [] did not tell any of these things to Deputy Waterman. He was cagey and evasive with Deputy Waterman . . .[[53]]
And moments after that, the prosecutor reiterated:
You heard about, again, Deputy Waterman. One of the most telling things about this case is the exchange between Deputy Waterman and the defendant. The defendant never needed to ask who this kid was that was making the accusations, because the defendant knew. He knew what had happened. He knew who was accusing him.[[54]]
¶ 35 In Doyle v. Ohio,[55] the United States Supreme Court held that when a defendant remains silent after receiving the Miranda warnings, his silence is "insolubly ambiguous."[56] He might be exercising the right to remain silent of which he was just advised, or he might be making a tacit admission of guilt. Because the Miranda warnings imply "that silence will carry no penalty," such "insolubly ambiguous" silence may not "be used to impeach an explanation subsequently offered at trial."[57] On the other hand, "[w]hen a defendant does not remain silent and instead talks to police, the state may comment on what he does not say."[58] "This `partial silence' . . . is not insolubly ambiguous, but `strongly suggests a fabricated defense and . . . properly impeaches the later defense.'"[59]
¶ 36 It is difficult to apply these principles to Waterman's testimony, in part because the *441 trial court neglected to enter written findings as required by CrR 3.5. It seems clear that Waterman commented improperly by testifying that after he gave McSorley the Miranda warnings, McSorley "did not respond" and "just sat there." But reading the record as a whole, it also seems clear that the trial court found McSorley's initial silence was short-lived, and that McSorley quickly and validly waived his Miranda rights. Assuming without holding that it is true,[60] Waterman could properly comment on what McSorley did not say after waiving.
¶ 37 It is even more difficult to apply these principles to the prosecutor's closing, as we cannot tell the extent to which the prosecutor was emphasizing McSorley's silence after receiving but before waiving his rights, versus the extent to which the prosecutor was emphasizing what McSorley did not say after waiving his rights. We need not pursue the matter further, however, as we are confident that all participants in the retrial will adhere to the principles set forth above.

V.
¶ 38 Pro se, McSorley argues that he was denied his right to speedy trial under CrR 3.3. If he is correct, we should dismiss with prejudice rather than grant a new trial. But the record does not show his arraignment or commencement dates or any continuances. Hence, we decline to dismiss with prejudice.
¶ 39 Any arguments not discussed lack merit or need not be reached. The judgment is reversed, and the case is remanded for new trial or such other proceedings as may be appropriate.
We concur: QUINN-BRINTNALL, C.J., and VAN DEREN, J.
NOTES
[1] Report of Proceedings (RP) at 62.
[2] RP at 62.
[3] RP at 63.
[4] RP at 68-69.
[5] RP at 85.
[6] RP at 92.
[7] RP at 92.
[8] RP at 17.
[9] RP at 20.
[10] RP at 20.
[11] RP at 20.
[12] RP at 74.
[13] McSorley apparently is diabetic.
[14] Clerk's Papers at 13; see RCW 9A.40.090(2).
[15] RP at 144.
[16] 99 Wash.2d 735, 664 P.2d 1216 (1983).
[17] Jones, 99 Wash.2d at 740, 664 P.2d 1216 (emphasis omitted).
[18] Jones, 99 Wash.2d at 743, 664 P.2d 1216.
[19] 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
[20] Faretta, 422 U.S. at 836, 95 S.Ct. 2525.
[21] Jones, 99 Wash.2d at 740, 664 P.2d 1216 (citations omitted) (quoting United States v. Laura, 607 F.2d 52, 56 (3d Cir.1979)).
[22] 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).
[23] Jones, 99 Wash.2d at 740, 664 P.2d 1216 (quoting Alford, 400 U.S. at 33, 91 S.Ct. 160) (emphasis added) (citation omitted).
[24] We are not asked to address, and thus we do not address, (1) whether the constitution permits the legislature to criminalize conduct that the State does not prove is unreasonable or accompanied by intent to harm; or (2) whether the constitution permits the legislature to impose on a defendant the burden of proving that he acted reasonably and without intent to harm.
[25] The State does not argue that Instruction 6 was harmless, and we do not think it could have been under the particular circumstances here.
[26] RP at 111-12.
[27] RP at 141-42.
[28] RP at 156.
[29] RP at 156-57.
[30] RP at 170.
[31] RP at 207.
[32] RP at 209.
[33] State v. McFarland, 127 Wash.2d 322, 334-35, 899 P.2d 1251 (1995).
[34] McFarland, 127 Wash.2d at 335, 899 P.2d 1251.
[35] McFarland, 127 Wash.2d at 337, 899 P.2d 1251.
[36] Br. of Appellant at 15 (emphasis omitted).
[37] See White v. Coplan, 399 F.3d 18, 26 (1st Cir.2005) ("White has narrowed his claim on appeal to cross-examination, and we are not endorsing any open-ended constitutional right to offer extrinsic evidence.").
[38] ER 404(a)(3).
[39] 143 Wash.2d 731, 24 P.3d 1006, cert. denied, 534 U.S. 1000, 122 S.Ct. 475, 151 L.Ed.2d 389 (2001).
[40] Clark, 143 Wash.2d at 766, 24 P.3d 1006 (some citations omitted).
[41] Clark, 143 Wash.2d at 767, 24 P.3d 1006.
[42] 28 Wash.App. 33, 621 P.2d 784 (1980); cf. State v. Wilson, 60 Wash.App. 887, 891-94, 808 P.2d 754 (trial court did not abuse discretion granted by ER 608(b) when it allowed State to impeach defense witness), review denied, 117 Wash.2d 1010, 816 P.2d 1224 (1991).
[43] York, 28 Wash.App. at 34, 621 P.2d 784.
[44] York, 28 Wash.App. at 35, 621 P.2d 784.
[45] York, 28 Wash.App. at 36-37, 621 P.2d 784 (citations omitted). On the right of confrontation, see also White, 399 F.3d 18 (trial court violated defendant's federal constitutional right to confront where, under particular circumstances, it applied ER 608(b) so as to preclude defendant from cross-examining State's witnesses with other instances of untruthfulness).
[46] York, 28 Wash.App. at 37, 621 P.2d 784.
[47] Clark, 143 Wash.2d at 766, 24 P.3d 1006; see also York, 28 Wash.App. at 35, 621 P.2d 784.
[48] York, 28 Wash.App. at 36, 621 P.2d 784.
[49] Clark, 143 Wash.2d at 766, 24 P.3d 1006.
[50] RP at 161.
[51] RP at 92 (emphasis added).
[52] RP at 153-54.
[53] RP at 156.
[54] RP at 164.
[55] 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).
[56] Doyle, 426 U.S. at 617, 96 S.Ct. 2240.
[57] Doyle, 426 U.S. at 618, 96 S.Ct. 2240.
[58] Clark, 143 Wash.2d at 765, 24 P.3d 1006; see State v. Belgarde, 110 Wash.2d 504, 511, 755 P.2d 174 (1988).
[59] Belgarde, 110 Wash.2d at 511-12, 755 P.2d 174 (quoting State v. Cosden, 18 Wash.App. 213, 221, 568 P.2d 802 (1977), review denied, 89 Wash.2d 1016, cert. denied, 439 U.S. 823, 99 S.Ct. 90, 58 L.Ed.2d 115 (1978)).
[60] We assume but do not decide that McSorley validly waived his Miranda rights. We have not been asked to review that issue, and the record before us does not contain the materials we would need to do that.