**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, Respondent, v. ERIC CLINTON OTT, Appellant. | No. 82624-7-I DIVISION ONE UNPUBLISHED OPINION |

MANN, J. — Eric Ott appeals his conviction for one count of incest in the first degree. Ott argues that the evidence was insufficient to prove the crime of incest. Ott also argues that the trial court abused its discretion under ER 608(b), and violated his Sixth Amendment right to confrontation when it limited the scope of his cross-examination of the alleged victim, T.P., based on several prior instances of dishonesty.

We affirm.

FACTS

T.P. was born in 1996. At that time, Ott and T.P.'s biological mother were married. Because both parents were facing terms of incarceration when T.P. was born, they relinquished their parental rights to her when she was two months old. T.P. was legally adopted by her maternal grandparents, and maintained contact with her parents

while growing up. T.P. visited her father in prison when she was 4 or 5 years old, and beginning at age 12, visited him 5 times before he was released. The two also often sent letters to each other and sometimes spoke on the phone. T.P. was close to Ott despite their physical separation and he was "the only person that [T.P.] would tell a lot of personal things to." Ott was released from prison in 2013 when T.P. was 18 years old.

Ott married Lacey in 2015.[1] Lacey and T.P. had a strained relationship. T.P. felt Lacey monopolized Ott's time. T.P. and Ott rarely visited because doing so "seemed to cause problems with [Ott's] marriage." Ott started to ignore T.P.'s phone calls; sometimes the two would only speak every few months.

Ott distanced himself from T.P. after she began using methamphetamine in 2017. While he told T.P. that her drug use was the reason he distanced himself, he was using methamphetamines as well. T.P. traveled to Washington from Arizona where she lived with her grandparents. On a night that Lacey was away, Ott invited T.P. to his home in Kirkland. Ott and T.P. used methamphetamines and conversed, with Ott lamenting that he "promised . . . to be more involved" in her life.

The next morning, Lacey returned and demanded that T.P. leave after she accused her of stealing. Angry, Ott left with T.P. and told Lacey "if my own kid can't be here, then I'm not going to be here either." Ott booked the two a motel room. Because of limited vacancy, the room had a single bed. T.P. and Ott spent the day using methamphetamines and watching YouTube videos.

---

[1] We refer to Lacey Ott by her first name to avoid confusion. We mean no disrespect.

Before sleeping, Ott began caressing T.P., "which eventually resulted in [them] having sex." T.P. claimed she agreed to have sex with Ott because she was afraid he would choose his relationship with Lacey over her unless she satisfied his needs. T.P. stated that she and Ott used methamphetamines and had sexual intercourse almost every day for the next several months. Ott told T.P. that other cultures tolerate incest. On November 9, 2018, Ott told T.P. that he needed to get some money from a friend. Instead, Ott returned to Lacey.

On November 29, 2018, Kirkland Police Detective Jacob Thune contacted T.P. in an unrelated matter over "circumstances that involved people at Lacey Ott's residence." Over the course of a few phone calls, T.P. developed a rapport with Thune. She eventually disclosed Ott's behavior and gave consent for police to search her phone.

On November 30, 2018, T.P. met with Thune and Detective Clayton Slominski. She told the detectives that she and Ott engaged in multiple acts of consensual sex and that Ott raped her once. She brought an LG Stylo 4 phone and a ZTE Max Blade 2 phone to the meeting. Incriminating text messages and photographs transmitted between Ott and T.P. were discovered on T.P.'s phone, including: (1) an image of Ott and T.P. lounging on a couch with ice packs over their genitals; (2) a text message from T.P. to Ott stating that "all I want to do right now is go back to the room and make love to you"; (3) a text message where Ott asked T.P. to "flash me in the bathroom window"; (4) an exchange where T.P. mentions smelling like Ott's cologne; (5) an exchange where Ott tells T.P. there are muffins for her in the kitchen and T.P. responds "[a]nd there is a muffin for you in my pants," to which Ott replies "fuck yes"; (6) a message

where T.P. tells Ott that she wants to "eat some meth, and suck your cock"; and (7) several erotic photographs T.P. sent of herself to Ott.

On December 7, 2018, Ott was arrested and he agreed to give a recorded statement. Ott acknowledged that T.P. was his daughter, admitted to using drugs with T.P., and explained that he left to get sober. He said T.P. started "spreading malicious stuff and talking bad about me." When asked about his sexual relationship with T.P., Ott responded, "[w]hy would you ask me a question like that?" Ott later admitted he was "not surprised that you're accusing me of it." Ott explained that the text messages were "extremely interpretive."

When shown a nude photograph that T.P. sent to Ott, he replied: "My—my daughter is an adult." In response to the message where T.P. offered to "suck [his] cock," Ott explained:

> I interpret that as myself and my daughter having a few different instances
> where she needed to be corrected about her behavior. That's how I
> interpret it.

During the interview, Ott insisted that the text messages, nude pictures, and time in hotel rooms does not prove the two were having sex. After the recording, Ott told Slominski that "I just want you to know off the record, I never raped her."

The State charged Ott with one count of second degree rape and three counts of first degree incest. A jury acquitted Ott of second degree rape but convicted him on all three counts of first degree incest. The court imposed a sentence within the standard range.

Ott appeals.

ANALYSIS

A. Sufficiency of Evidence

Ott argues first that the evidence was insufficient to prove the crime of incest because the State failed to prove that T.P. was his biological daughter. We disagree.

We review the sufficiency of the evidence to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Luther, 157 Wn.2d 63, 77-78, 134 P.3d 205 (2006); Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). A defendant claiming insufficient evidence "admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." State v. Scanlan, 193 Wn.2d 753, 770, 445 P.3d 960 (2019) (quoting State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). A sufficiency analysis is "highly deferential" to the jury's verdict. State v. Davis, 182 Wn.2d 222, 227, 340 P.3d 820 (2014). Whether sufficient evidence exists is a question of law reviewed de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

A person commits the crime of incest in the first degree if "he or she engages in sexual intercourse with a person whom he or she knows to be related to him or her . . . as a[] . . . descendant." RCW 9A.64.020(1)(a). Under the statute, "descendant" includes children and adopted children under 18. RCW 9A.64.020(3)(a). Thus, a person 18 or older is a "descendant" only if they are biologically related to the person charged. State v. Hall, 112 Wn. App. 164, 167-69, 48 P.3d 350 (2002) (RCW 9A.64.020(3)(a) "expresses the legislative intent that the biological, not the legal, relationship controls.").

Ott was married to T.P.'s biological mother when T.P. was born and Ott was therefore presumed to be T.P.'s father as a matter of law. RCW 26.26A.115(1)(i). T.P. testified that Ott was her father and Ott acknowledged the same. Ott never denied that T.P. was his biological daughter.

Ott argues that there is insufficient evidence that T.P. was his biological "descendant" because the State did not confirm their relationship with DNA testing or "a sworn statement attesting to biological paternity." Instead, Ott claims that presumed paternity, under the Uniform Parentage Act conferred legal paternity on men but that this presumed paternity does not prove Ott is T.P.'s biological father.

Ott fails to offer Washington authority supporting his claim that DNA testing is required to prove a biological relationship to support the crime of incest. In State v. Coffey, 8 Wn.2d 504, 505-06, 112 P.2d 989 (1941), and State v. Davis, 20 Wn.2d 443, 446-47, 147 P.2d 940 (1944), the Washington Supreme Court held that uncorroborated testimony of a complaining witness in an incest case is enough to sustain a conviction. The Davis holding was more recently affirmed in State v. Chenoweth, 188 Wn. App. 521, 536, 354 P.3d 13 (2015) (explaining, "this [Davis] holding has not been overruled, and no statute requires corroboration in incest cases"). There is no support for the argument that the Washington courts specifically require DNA testing or a sworn statement to prove that Ott is T.P.'s biological father.

Other jurisdictions have expressly rejected Ott's argument. In State v. Ware, 188 N.C. App. 790, 793-94, 656 S.E.2d 662 (2008), the court found sufficient evidence of a biological relationship without DNA testing:

The victim testified at trial that defendant was her biological father and identified him in open court. Furthermore, the victim's birth certificate, clearly identifying defendant to be the victim's father, was admitted into evidence. Both the victim's testimony and her birth certificate are direct evidence of defendant's paternity. The crime of incest was first created by our legislature long before the advent of DNA or blood type paternity testing. . . . We hold that witness testimony and birth records are substantial evidence of paternity.

In Jackson v. State, 682 N.E.2d 564, 566 (Ind. Ct. App. 1997), the Indiana Court of Appeals similarly determined there was sufficient evidence to establish paternity through other evidence in the record such as the victim's testimony, the victim had the family name, and that the alleged father paid child support. The Montana Supreme Court also established paternity through various evidence:

A conviction for a sex offense may be based entirely on the uncorroborated testimony of the victim . . . Here, testimony that Skinner is T.D.'s biological father was given not just by T.D., but also by T.D.'s mother. Further, T.D. and Skinner had been exchanging letters for two years, T.D. had labeled Skinner "Dad" in her scrapbook, and T.D. considered Skinner's sister as her aunt and Skinner's nephew as her cousin. Based on this evidence, a rational trier of fact could conclude, beyond a reasonable doubt, that Skinner was T.D.'s biological father.

State v. Skinner, 2007 MT 175, 338 Mont. 197, 202, 163 P.3d 399.

Ott presents seven cases from other jurisdictions for support, but these cases do not describe specific requirements to prove biological paternity. Rather, four of the cases use either DNA evidence or testimony by the other biological parent. The cases simply discuss what evidence the court used to determine a rational trier of fact could find biological paternity, none impose any requirements.

T.P. addresses Ott as her father, Ott addresses T.P. as his daughter, and Ott was married to T.P.'s biological mother when she was born. Taken in the light most

favorable to the prosecution, a rational jury could have found that Ott was T.P.'s biological father.

B. Prior False Statements

Ott next contends that the trial court abused its discretion and violated his Sixth Amendment right to confrontation when it limited the scope of his cross-examination of T.P. based on several prior instances of dishonesty. We disagree.

Our review of a Sixth Amendment claim invokes a two-part test. We first review the trial court's evidentiary rulings for abuse of discretion. State v. Jennings, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022); State v. Arndt, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019). If we conclude that the evidentiary rulings were not an abuse of discretion, we then consider de novo whether the exclusion of evidence violated the defendant's constitutional right to present a defense. Jennings, 199 Wn.2d at 59.

Before trial, Ott sought permission to impeach T.P. based on prior instances of dishonesty. The prior instances fell into two categories: (1) instances in which T.P. stole money or property, or lied to get money; and (2) instances in which T.P. gave false statements to law enforcement or family members unrelated to money.

Ott first moved to admit T.P.'s prior convictions for third degree theft and second degree possession of stolen property under ER 609(a)(2). The trial court admitted these convictions, without objection, but denied Ott's request to elicit their underlying facts.

Ott later moved to cross-examine T.P. on specific instances of dishonestly under ER 608(b). The State agreed that some instances were admissible "because they deal with some of the people involved in this case and are from this specific time period that

we're talking about here."  The State agreed that T.P. could be questioned about four specific instances: (1) that T.P. stole money from Lacey, (2) that T.P. lied to Lacey about being in rehab, (3) that T.P. borrowed money from Ott's ex-girlfriend under false pretenses and used it to buy drugs, and (4) that T.P. stole from her biological mother.

At issue are three other instances of dishonesty that the trial court excluded. First, Ott sought to admit T.P.'s prior conviction for disorderly conduct under ER 608. Second, Ott sought to elicit that T.P. falsely told the father of her second child that another man was the child's biological parent.  Third, Ott sought to cross-examine T.P. about her alleged false accusation that her first child's father had raped her because she feared her family would not approve of their interracial relationship.  The trial court excluded all three instances.  Ott challenges the trial court's limitation on the scope of his cross-examination of T.P.

### 1.  Evidentiary Rulings

We begin with the trial court's evidentiary rulings.  Under ER 608(b), a party may, "in the discretion of the court," and if the conduct is "probative of . . . untruthfulness," cross-examine a witness about "[s]pecific instances of . . . misconduct" to attack the witness's credibility.  ER 608(b) states:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility . . . may not be proved by extrinsic evidence.  They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

In exercising its discretion under ER 608(b), the trial court considers "whether the instance of misconduct is relevant to the witness's veracity on the stand and whether it is germane or relevant to the issues presented at trial. O'Connor, 155 Wn.2d at 349. "[N]ot every instance of a witness's (even a key witness's) misconduct is probative of a witness's truthfulness or untruthfulness under ER 608(b)." O'Connor, 155 Wn.2d at 350.

On the other hand, "[f]ailing to allow cross-examination of a state's witness under ER 608(b) is an abuse of discretion if the witness is crucial and the alleged misconduct constitutes the only available impeachment." State v. Clark, 143 Wn.2d 731, 766, 24 P.3d 1006 (2001).

Because the trial court here relied mainly on State v. Lee, 188 Wn.2d 473, 396 P.3d 316 (2017), a brief discussion is appropriate. [2] In Lee, the defendant was charged with third degree rape of a child for engaging in sexual intercourse with a child, J.W. Lee, 188 Wn.2d at 478-79. At trial, Lee sought "to introduce evidence that J.W. previously fabricated a rape allegation against another individual." Lee, 188 Wn.2d at 479. The trial court allowed the defense to elicit that J.W. "made a prior false accusation about another person to police . . . [but] prohibited Lee from specifying that it was a rape accusation." Lee, 188 Wn.2d at 480. Lee argued that the ruling violated his right to confront J.W. Lee, 188 Wn.2d at 486.

To determine whether the restriction on Lee's cross-examination was constitutionally permissible, the court applied a three-part test:

---

[2] While Lee specifically addressed the constitutional right to confrontation and did not analyze application of ER 608(b), the trial court here did not abuse its discretion in relying on the analysis.

> First, the evidence must be of at least minimal relevance. Second, if relevant, the burden is on the State to show the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial. Finally, the State's interest to exclude prejudicial evidence must be balanced against the defendant's need for the information sought, and only if the State's interest outweighs the defendant's need can otherwise relevant information be withheld.

Lee, 188 Wn.2d at 488. The court determined that the prior false accusation had "minimal probative value because it did not directly relate to an issue in the case." Since the proposed impeachment did not purport to show any specific bias towards Lee, it was essentially propensity evidence. Lee, 188 Wn.2d at 488. The court explained that:

> The confrontation clause primarily protects "cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness <u>as they may relate directly to issues or personalities in the case at hand</u>." Evidence intended to paint the witness as a liar is less probative than evidence demonstrating a witness' bias or motive to lie in a specific case.
>
> Here, Lee did not offer the prior false accusation evidence to demonstrate that J.W. was biased or that she had a motive to lodge a false accusation against him. Instead, he invited the jury to infer that because J.W. made a false rape accusation in the past, her accusation here must also be false. . . . A prior false statement admitted for this purpose has questionable probative value because it does not directly relate to issues in the case.

Lee, 188 Wn.2d at 489-90 (internal citations omitted).

The court then determined the proposed evidence was unduly prejudicial given its "low probative value here." Lee, 188 Wn.2d at 493. The court noted that a false rape accusation is likely to "distract and inflame jurors," a risk that is constitutionally unnecessary "when the prior false accusation bears no direct relationship to the issues in the case." Lee, 188 Wn.2d at 493.

In summary, the court's holding rested on three interrelated bases: (1) that the prior false accusation was more prejudicial than probative because it bore "no direct relationship to the issues in the case"; (2) that "[t]he State's compelling interest in encouraging rape victims to report and cooperate . . . outweighs Lee's need to specify that J.W.'s prior false accusation was a "rape accusation"; and (3) that Lee's defense was minimally impacted because he could attack J.W.'s credibility in other ways. Lee, 188 Wn.2d at 493-96.

### a. False Statement to Police

Ott argues that the trial court abused its discretion in not admitting evidence of T.P.'s prior conviction for disorderly conduct under ER 608. Ott argued that the conviction was admissible because the original complaint alleged that T.P. provided a false name to the police. T.P. had eventually pleaded guilty to an amended charge of disorderly conduct.[3]

Relying first on Lee, the trial court determined the alleged incident was outside the purview of ER 608(b) because it did not demonstrate bias in this particular case and was therefore only minimally relevant. And, under ER 403, the court determined that the evidence was substantially more prejudicial than probative.

The trial did not abuse its discretion. The alleged false statement at issue was at best only minimally relevant to show a propensity for T.P. to lie. There was no

---

[3] Ott originally sought to admit the incident under ER 609. ER 609 testimony is "limited to examining 'the elements and date of the prior conviction, the type of crime, and the punishment imposed.'" State v. Garcia, 179 Wn.2d 828, 847, 318 P.3d 266 (2014) (quoting State v. Newton, 109 Wn.2d 69, 71, 743 P.2d 254 (1987)). The prior conviction was inadmissible under ER 609. While the facts alleged a false statement, disorderly conduct is not a crime of dishonestly under ER 609(a)(2). RCW 9A.84.030. The conviction was also inadmissible under ER 609(a)(1) because disorderly conduct is a simple misdemeanor. RCW 9A.84.030(2).

argument that T.P.'s attempt to mislead police had any connection to Ott or demonstrated T.P.'s bias against him. It was not reasonable to infer that someone willing to lie about their name in order to avoid arrest would be more likely to falsely accuse their father of incest or rape. Consistent with O'Connor, the alleged incident was only minimally relevant to T.P.'s veracity and was not germane or relevant to the issues presented at trial. 155 Wn.2d at 349.

       b.  Statement on Parentage

Ott sought to cross-examine T.P. on allegations that she falsely told the father of her second child that another man was the child's biological parent. The trial court found the allegation was essentially propensity evidence and had little bearing on whether T.P. lied about the rape or incest. The court also explained its exclusion under ER 403:

> why would a mother lie about the paternity of her child? There are many possible reasons for that potentially relating to concerns about the relationship she had with the actual father, the biological father, concerns about the relationship that she has with the married husband, concerns about the effect that this might have on the well-being of the child. There are many difficult reasons that that kind of a lie might come in, and ultimately I'm going to find that the probative value is extremely low and that the likelihood of prejudice by the jury with that low probative value is extremely high.

> And so, even if it were relevant, even if it could be proven by a preponderance of the evidence, ER 403 would say it's not admissible.

The trial court did not abuse its discretion. Whether T.P. lied to the father or not is a collateral matter with no relevance to Ott. Evidence of a witness's truthfulness or untruthfulness is admissible only if it is relevant to the subject of the prosecution. O'Connor, 155 Wn.2d at 350. This evidence does not demonstrate a motive for T.P. to

lie about Ott, nor is it related, thus, the court properly excluded this line of cross-examination.

    c. <u>False Rape Allegation</u>

Ott sought to cross-examine T.P. on her alleged false accusation that her first child's father raped her because she feared her family would not approve of their interracial relationship. Ott argued that T.P. lied because of the social consequences, which is analogous to this case because T.P. falsely accused Ott "to present to the family members an account that puts her in the victim role."

In excluding the accusation, the trial court applied the analysis from <u>Lee</u> to conclude the evidence is more prejudicial than probative, explaining:

> [F]irst of all . . . this was not a false report to the police which is a substantially more serious step than simply telling a family member . . . <u>Lee</u> also talks about the fact that this kind of evidence is really intended to paint the witness as a liar, and is therefore less probative than evidence demonstrating a witness' bias or motive to lie in this specific case.

> [I]t is less probative because the facts [regarding Derick] are not similar to the allegations . . . in Mr. Ott's particular case. So . . . the <u>Lee</u> court goes on to look at the allegations to determine whether they can be tied to the facts here and I'm going to find that as in <u>Lee</u>, the alleged false allegation is not offered to demonstrate that [T.P.] is biased against Mr. Ott or that she had a motive to lodge a false accusation against him.

> In other words, the evidence related to the . . . alleged false rape claim [against Derick] . . . is not evidence that would demonstrate she's biased against Mr. Ott or that she had a motive to lodge a false accusation against him. And the <u>Lee</u> court goes on to say that courts generally disfavor evidence that's intended to suggest that because a person acted wrongly in the past, they must be doing so now . . . that's the first, that there has to be some relevance.

> The second is the prejudice that might occur . . . the issue is whether or not the evidence is so prejudicial as to disrupt the fairness of the fact finding process at trial.
>     . . . .

[Lee concluded that] a prior false rape accusation may distract and inflame jurors with evidence of arguable probative worth. This is particularly true, they state, when the prior false accusation bears no direct relationship to the issues of the case, which is what I have found here . . . that the evidence is too thinly minimal or too thinly relevant. It is very prejudicial and in balancing it, the interest of a fair trial outweighs the defendant's need for this otherwise minimally relevant evidence.

Consistent with Lee, there is no demonstrated motive or bias toward Ott from this allegation. The evidence about an alleged false rape allegation, with no connection to Ott, is simply propensity evidence. It is not enough to suggest that because T.P. lied about a past rape, she would be lying about incest. The topics are only tangentially related and as stated in Lee, propensity evidence does not become admissible because it is topically related to the present charges. Lee, 188 Wn.2d at 490.

Additionally, any minimally probative value was substantially outweighed by unfair prejudice to the State. Lee held that this type of propensity evidence had an effect "similar to the prejudice caused by prior sexual acts," and disrupted the State's compelling interest in encouraging victims of abuse to come forward. 188 Wn.2d at 494-95. The same rationale applies here. The trial court did not abuse its discretion in applying Lee and prohibiting cross-examination based on the incident.

d.  York and McSorely

Ott argues that the court violated the standards applied in State v. York, 28 Wn. App. 33, 621 P.2d 784 (1981), and State v. McSorely, 128 Wn. App. 598, 116 P.3d 431 (2005), when it excluded cross-examination based on T.P.'s prior incidents of dishonesty. Both cases are distinguishable.

In York, the defendant was charged with delivery of a controlled substance. 28 Wn. App. at 34. The evidence consisted of testimony from an undercover agent who

-15-

claimed to have bought two bags of marijuana from the defendant. York, 28 Wn. App. at 34. The defense sought to present witnesses that the agent had a motive to fabricate the claim and to cross-examine the agent on his dismissal from a similar position with a sheriff's department for "irregularities in his paperwork procedures, and his general unsuitability for the job." York, 28 Wn. App. at 34-35. The trial court excluded the impeachment evidence as collateral evidence. York, 28 Wn. App. at 35.

The Court of Appeals did not address ER 608(b), but instead considered York's constitutional right to cross-examine witnesses. The court explained that the State introduced the agent's background as a military policeman investigating drug usage and his previous work as an undercover agent. But the State then sought pretrial suppression of the agent's prior employment as a trainee in drug related undercover work and his subsequent dismissal. York, 28 Wn. App. at 37. The court explained "'[i]t would be a curious rule of evidence which allowed one party to bring up a subject, drop it at a point where it might appear advantageous to him, and then bar the other party from all further inquiries about it.'" York, 28 Wn. App. at 37 (quoting State v. Gefeller, 76 Wn.2d 449, 455, 458 P.2d 17 (1969)). The court concluded that, as a matter of fundamental fairness, the "defense should have been allowed to bring out the only negative characteristics of the one most important witness against York." York, 28 Wn. App. at 37.

In McSorely, the State's key witness was a 10-year-old boy who testified that the defendant drove by the boys' school bus stop a couple of times and then pulled over to order the boys in the vehicle. 128 Wn. App. at 600. The defense sought to cross-examine the boy on two prior instances of yelling wildly at passing cars and yelling

profanities and pretending to have crashed his bike in the middle of the road.  McSorely, 128 Wn. App. at 600.  The trial court excluded both incidents.  McSorely, 128 Wn. App. at 600.

The Court of Appeals reversed.  McSorely, 128 Wn. App. at 610-11, 614.  Applying Clark, 143 Wn.2d at 766, and York, the court held that, on remand, the defendant must be permitted to cross-examine the boy on his prior pranks, provided the defense could show they were not too remote in time to be relevant.  McSorely, 128 Wn. App. at 614.  The court found error mainly because the trial court excluded the "only available impeachment," and it was "[o]nly because of [this] exclusion [that] the prosecutor [was] able to assert in closing argument, without controversion, that [the victim] . . . is not . . . going to say things that aren't true."  McSorely, 128 Wn. App. at 613.

But unlike York and McSorely, the trial court did not exclude the only impeachment evidence, rather, it specifically admitted acts of dishonesty with some relationship to the case.  The trial court allowed Ott to introduce T.P.'s prior convictions, her theft from Lacey and lie to Lacey, as well as her borrowing money under false pretenses to buy drugs.  Based on defense's cross-examination of T.P., Ott argued extensively about T.P.'s lack of credibility, memory, and motivation based on her drug use, rehab, relapse, and "meth-induced psychosis."

The trial court did not abuse its discretion in applying ER 608(b) and limiting the scope of cross-examination of T.P. by precluding use of the three challenged incidents of dishonesty.

2. Right to Confrontation

Because we conclude that the trial court's evidentiary rulings were not an abuse of discretion, we next consider whether the trial court violated Ott's Sixth Amendment right to confrontation by limiting the scope of the cross-examination of T.P. Jennings, 199 Wn.2d at 59; Arndt, 194 Wn.2d at 797-98.

A defendant has a constitutional right to present a defense and to confront an adverse witness. U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, § 22. Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); State v. Arredondo, 188 Wn.2d 244, 265, 394 P.3d 348 (2017). "Cross-examination is the 'principal means by which the believability of a witness and the truth of his testimony are tested.'" Arredondo, 188 Wn.2d at 255 (quoting Davis v. Alaska, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974)). "Whenever the right to confront is denied, the ultimate integrity of this fact-finding process is called into question. . . . As such, the right to confront must be zealously guarded." State v. Darden, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002).

But neither the right to present a defense nor the right to cross-examination is absolute. "'The scope of such cross examination is within the discretion of the trial court.'" Arredondo, 188 Wn.2d at 266 (quoting State v. Russell, 125 Wn.2d 24, 92, 882 P.2d 747 (1994)). A limitation on cross-examination violates the confrontation clause where the testimony sought by the defendant, but excluded by the trial court, is (1) minimally relevant, (2) not so prejudicial as to disrupt the fairness of the fact-finding process at trial, and (3) the defendant's need for relevant but prejudicial information outweighs the State's interest in withholding that information from the jury.

Arredondo, 188 Wn.2d at 266 (citing State v. Jones, 168 Wn.2d 713, 720-21, 230 P.3d 576 (2010); Darden, 145 Wn.2d at 622; State v. Hudlow, 99 Wn.2d 1, 15, 659 P.2d 514 (1983)). "No State interest is sufficiently compelling to preclude evidence with highly probative value." Arredondo, 188 Wn. 2d at 266. We review de novo whether the trial court's evidentiary rulings violated a defendant's Sixth Amendment rights. State v. Orn, 197 Wn.2d 343, 350, 482 P.3d 913 (2021).

Here, we agree with the trial court that all three excluded incidents of alleged prior dishonesty were, at best, of only minimal relevance. Consistent with Lee, none of the three incidents related to the issues or personalities in the case. The incidents did not demonstrate that T.P. was biased against Ott or relate to the allegations of incest between T.P. and Ott. Instead, the incidents were little more than propensity evidence—because T.P. had previously given false statements she must be doing the same here. "A prior false statement admitted for this purpose has questionable probative value because it does not directly relate to issues in the case." Lee, 188 Wn.2d at 489-90.

We also agree with the trial court that, consistent with ER 403, ER 404, ER 608(b), and Lee, Ott's need for the three excluded incidents did not outweigh the State's interest in withholding the propensity evidence from the jury. Finally, as discussed earlier, the trial court's actions precluding cross-examination based on the three prior incidents only limited the scope of Ott's cross-examination. The trial court allowed Ott to introduce T.P.'s prior convictions, her theft from Lacey and lie to Lacey, as well as her borrowing money under false pretenses to buy drugs. Based on defense's cross-examination of T.P., Ott argued extensively about T.P.'s lack of credibility, memory, and

motivation, based on her drug use, rehab, relapse, and "meth-induced psychosis." The trial court's limitation on the scope of cross-examination did not violate Ott's right to confrontation.

Affirmed.

_____Mann, J._____

WE CONCUR:

_____Coburn, J._____          _____Hazelrigg, J._____